Michael J. Gearin, WSBA # 20982
David C. Neu, WSBA #33143
K& L GATES, LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580

Jane Pearson WSBA # 12785
Foster Pepper PLLC
1111 Third Avenue, Suite 3400
Seattle, WA 98101
(206) 447-4400

Honorable Karen A. Overstreet
Chapter 11

# UNITED STATES BANKRUPTCY COURT

## WESTERN DISTRICT OF WASHINGTON

### AT SEATTLE

In re:

MERIDIAN MORTGAGE INVESTORS
FUND I, LLC; MERIDIAN MORTGAGE
INVESTORS FUND II, LLC; MERIDIAN
MORTGAGE INVESTORS FUND III, LLC
MERIDIAN MORTGAGE INVESTORS
FUND V, LLC; MERIDIAN MORTGAGE
INVESTORS FUND VI, LLC; MERIDIAN
MORTGAGE INVESTORS FUND VII, LLC;
MERIDIAN MORTGAGE INVESTORS
FUND VIII, LLC; MERIDIAN MORTGAGE
INVESTORS FUND IX, LLC; MERIDIAN
MORTGAGE INVESTORS FUND X, LLC;
MPM INVESTOR SERVICES, INC.
MERIDIAN REAL ESTATE OPPORTUNITY
FUND I, LLC; MERIDIAN REAL ESTATE
OPPORTUNITY FUND II, LLC,

                    Debtors.

Jointly Administered under
Case No. 10-17952

Case Nos. 10-17952; 10-17953; 10-18727;
10-17958; 10-17976; 10-18728; 10-18729;
10-19644; 10-19645; 11-10830; 11-10833;
11-10834

## DISCLOSURE STATEMENT FOR CHAPTER 11 TRUSTEE'S AND OFFICIAL CONSOLIDATED INVESTORS' COMMITTEE'S JOINT PLAN OF LIQUIDATION

### IMPORTANT DATES

- Date by which Ballots must be received: **[TO COME]**

- Date by which objections to Confirmation of the Plan must be filed and served: **[TO COME]**
- Hearing on Confirmation of the Plan: **[TO COME]**

## DISCLAIMER

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE CHAPTER 11 TRUSTEE'S AND OFFICIAL CONSOLIDATED INVESTORS' COMMITTEE'S JOINT PLAN OF LIQUIDATION (AS AMENDED FROM TIME TO TIME, THE "*PLAN*"), A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>, AS WELL AS CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE PLAN PROPONENTS BELIEVE THAT THESE SUMMARIES CONSTITUTE THE BEST INFORMATION AVAILABLE TO THE CHAPTER 11 TRUSTEE AS A RESULT OF HIS INVESTIGATION INTO THE DEBTORS' ASSETS AND LIABILITIES. THE PLAN PROPONENTS, HOWEVER, MAKE NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN IN LIGHT OF THE FRAUD PERPETUATED BY THE DEBTORS PRIOR TO THESE CHAPTER 11 CASES, THE ACCOUNTING IRREGULARITIES INVOLVED WITH SUCH FRAUD, AND THE POOR QUALITY OF THE DEBTORS' BOOKS AND RECORDS. THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLAN, OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER BUT RATHER SHOULD BE CONSTRUED AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

SUBJECT TO THE DISCLAIMERS HEREIN, THE PLAN PROPONENTS MAKE THE STATEMENTS AND PROVIDE THE FINANCIAL INFORMATION CONTAINED HEREIN AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE HEREOF

UNLESS SO SPECIFIED. EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE THEREFORE SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT, AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY PERSONS DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO PARTY IS AUTHORIZED TO PROVIDE TO ANY OTHER PARTY ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE CONTENTS OF THIS DISCLOSURE STATEMENT. THE PLAN PROPONENTS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THE PLAN PROPONENTS HAVE OBTAINED AUTHORITY FROM THE COURT TO MAKE A PRESENTATION TO CREDITORS AND PARTIES IN INTEREST AT THE UNIVERSITY OF WASHINGTON, KANE HALL FOR THE PURPOSE OF EXPLAINING THE PLAN AND DISCLOSURE STATEMENT AND ANSWERING QUESTIONS WITH RESPECT TO THE PLAN AND PLAN PROCESS. THE MEETING WILL BE HELD ON _____, 2011 AT _____ .M.

THE TRUSTEE AND OFFICIAL CONSOLIDATED INVESTORS' COMMITTEE, WHO ARE THE PLAN PROPONENTS, BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND REPRESENTS THE BEST POSSIBLE OUTCOME FOR CREDITORS FOR A NUMBER OF REASONS, INCLUDING THE FOLLOWING:

- THE PLAN CONSTITUTES A GLOBAL SETTLEMENT OF WHAT WOULD OTHERWISE BE PROTRACTED AND EXPENSIVE LITIGATION BETWEEN AND AMONG THE FUNDS AND ELECTING INVESTORS RELATING TO PONZI RECOVERIES AND FRAUDULENT TRANSFERS.

- THE PLAN MINIMIZES THE RISK THAT AN INVESTOR WILL BE REQUIRED TO WRITE A CHECK TO THE ESTATES.

- THE PLAN SUBSTANTIVELY CONSOLIDATES THE FUNDS BECAUSE OF (1) BERG'S EXTENSIVE COMMINGLING OF ASSETS AND HIS COMPLETE DISREGARD OF CORPORATE FORMALITIES AND BOUNDARIES; (2) THE INADEQUACY OF RECORDS OF THE DEBTORS NECESSARY TO UNWIND THE AFFAIRS OF THE FUNDS;

AND (3) THE PROHIBITIVELY EXPENSIVE COST OF UNWINDING THE ECONOMIC RELATIONSHIPS AMONG THE FUNDS.

- SUBSTANTIVE CONSOLIDATION OF THE FUNDS FACILITATES A MORE EFFICIENT LIQUIDATION AND DISBURSEMENT OF THE ASSETS OF THE ESTATES.

- THE PLAN FACILITATES AN ORDERLY AND CONSISTENT TREATMENT OF ALL INVESTOR CLAIMS ON A FAIR AND EQUITABLE BASIS.

- THE PLAN ALLOWS FOR THE RETENTION OF REAL ESTATE RELATED ASSETS FOR A PERIOD DESIGNED TO MAXIMIZE THE LIQUIDATION VALUE OF THOSE ASSETS.

- THE PLAN RETAINS, IN THE LIQUIDATING TRUST, RIGHTS TO PURSUE CLAIMS AGAINST INSIDERS AND THIRD PARTIES WHO CONTRIBUTED TO THE LOSSES SUFFERED BY THE ESTATES.

- THE PLAN PROVIDES A MEANS FOR ELECTING INVESTORS TO CONSOLIDATE THEIR PURSUIT OF THIRD PARTY CLAIMS, ALLOWING FOR AN EFFICIENT MEANS OF REALIZATION ON THOSE CLAIMS.


THE PLAN PROPONENTS THEREFORE RECOMMEND THAT ALL HOLDERS OF UNSECURED CONVENIENCE CLASS AND GENERAL UNSECURED CLAIMS SUBMIT BALLOTS TO ACCEPT THE PLAN.

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

        A.      PLAN OVERVIEW/ EXECUTIVE SUMMARY...........................................2
                1.      Solicitation ...........................................................................................2
                2.      Purpose of the Liquidating Plan..........................................................3
                3.      Substantive Consolidation ...................................................................3
                4.      Establishment of the Liquidating Trust...............................................3
                5.      Summary of Projected Distributions to Creditors................................4
                6.      Voting and Confirmation ......................................................................7
                7.      Risk Factors ..........................................................................................8

        B.      RECOMMENDATION ..................................................................................9

        C.      DISCLAIMER ...............................................................................................9

II.     THE CHAPTER 11 CASES ................................................................................10

        A.      THE BEGINNING OF THE CHAPTER 11 CASES ..................................10
                1.      The Involuntary Petitions...................................................................10
                2.      The Shay Declaration's Allegations Against the Meridian Funds.............10
                3.      Motions for Joint Administration of the Chapter 11 Cases ................11
                4.      Motion to Restrain the Debtors' Operations; Appointment of
                        Chapter 11 Trustee..............................................................................11
                5.      Voluntary Bankruptcy Filings of Remaining Debtors ........................12

        B.      THE CHAPTER 11 TRUSTEE'S ACTIVITIES ..........................................12
                1.      Investigation.......................................................................................12
                2.      Schedules and Statement of Financial Affairs ...................................14
                3.      Claims Bar Date..................................................................................14

        C.      OFFICIAL CONSOLIDATED INVESTORS' COMMITTEE
                FORMATION ...............................................................................................15

        D.      BERG'S PERSONAL BANKRUPTCY CASE AND BERG ENTITIES
                BANKRUPTCY CASES ...............................................................................16

        E.      FEDERAL INVESTIGATION AND PROSECUTION OF BERG......................17

        F.      FORMULATION OF CHAPTER 11 PLAN TERMS ..................................17
                1.      Sources of Investor Recoveries...........................................................17
                2.      Substantive Consolidation ..................................................................18
                3.      The Plan Proponent's Plan Proposal...................................................19

III.    SUMMARY OF THE LIQUIDATING chapter 11 PLAN......................................21

        A.      CHAPTER 11 PLANS...................................................................................21

        B.      GENERALLY................................................................................................22
                1.      Liquidating Chapter 11 Plan ...............................................................22
                2.      The Liquidating Trust .........................................................................22

        C.      CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
                INTERESTS ..................................................................................................22
                1.      Treatment of Unclassified Claims .......................................................23

|   | 2. | Schedule of Treatment of Claims and Equity Interests | 24 |
|   | 3. | Classification and Treatment of Classified Claims | 24 |
|   | 4. | Class 1 – Other Priority Claims | 24 |
|   | 5. | Class 2 – Secured Claims | 25 |
|   | 6. | Class 3 – Unsecured Claims | 25 |
|   | 7. | Class 4 – Equity Interests | 27 |
| D. | MEANS FOR IMPLEMENTATION OF THE PLAN | | 27 |
|   | 1. | The Plan Global Investor Settlement | 27 |
|   | 2. | The Liquidating Trustee | 31 |
|   | 3. | Oversight Committee | 33 |
| E. | FINAL ADMINISTRATION OF LIQUIDATING TRUST | | 35 |
| F. | CORPORATE ACTION | | 35 |
| G. | PRESERVATION OF RIGHTS | | 35 |
| H. | PONZI SCHEME INVESTIGATION AND RELATED LITIGATION | | 38 |
| I. | CANCELLATION OF NOTES, INSTRUMENTS, DEBENTURES, AND EQUITY INTERESTS | | 40 |
| J. | DISSOLUTION OF INVESTOR COMMITTEE | | 40 |
| K. | ACCOUNTING | | 40 |
| L. | TREATMENT OF DISPUTED CLAIMS | | 40 |
|   | 1. | Objections to Claims; Prosecution of Disputed Claims | 40 |
|   | 2. | The deadline to object to Claims shall be December 31, 2012 | 40 |
|   | 3. | Estimation of Claims | 41 |
|   | 4. | Disputed Claims Reserve | 41 |
|   | 5. | Payments and Distributions on Disputed Claims | 41 |
| M. | DISTRIBUTIONS | | 41 |
| N. | MEANS OF CASH PAYMENT | | 42 |
| O. | DELIVERY OF DISTRIBUTIONS | | 42 |
| P. | UNDELIVERABLE DISTRIBUTIONS | | 42 |
|   | 1. | Holding of Undeliverable Distributions | 42 |
|   | 2. | Failure to Claim Undeliverable Distributions | 42 |
|   | 3. | Final Distribution of Unclaimed Funds | 42 |
|   | 4. | Liquidating Trustee Not Obligated to Locate Holders of Claims | 43 |
|   | 5. | Withholding and Reporting Requirements | 43 |
|   | 6. | Time Bar to Cash Payments | 43 |
|   | 7. | Distributions After the Effective Date | 43 |
|   | 8. | Interest | 43 |
|   | 9. | Fractional Dollars; De Minimis Distributions | 43 |
|   | 10. | Set-Offs | 44 |
| Q. | EXECUTORY CONTRACTS | | 44 |
|   | 1. | Rejection of Executory Contracts and Unexpired Leases | 44 |
|   | 2. | Rejection Damages Claim | 44 |
| R. | INSURANCE POLICIES | | 45 |
| S. | EFFECT OF PLAN CONFIRMATION | | 45 |

|  |  | 1. | Termination of Subordination Rights and Settlement of Related Claims | 45 |
|  |  | 2. | Injunction | 45 |
|  |  | 3. | Terms of Existing Injunctions or Stays | 45 |
|  |  | 4. | Exculpation | 45 |
|  | T. | RETENTION OF JURISDICTION | | 46 |
|  | U. | OTHER PROVISIONS | | 47 |
| IV. | | ACCEPTANCE OR REJECTION OF THE PLAN | | 47 |
|  | A. | CLASSES ENTITLED TO VOTE | | 47 |
|  | B. | ACCEPTANCE BY IMPAIRED CLASSES | | 48 |
|  | C. | PRESUMED ACCEPTANCE OF THE PLAN | | 48 |
|  | D. | PRESUMED REJECTION OF THE PLAN | | 48 |
| V. | | PROCEDURES FOR VOTING ON THE PLAN | | 48 |
|  | A. | VOTING DEADLINE | | 48 |
|  | B. | VOTING RECORD DATE | | 48 |
|  | C. | THE CONFIRMATION HEARING | | 48 |
| VI. | | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN | | 49 |
|  | A. | GENERALLY | | 49 |
|  | B. | FEASIBILITY | | 50 |
|  | C. | "BEST INTERESTS" TEST | | 50 |
|  | D. | ACCEPTANCE BY IMPAIRED CLASSES | | 51 |
| VII. | | PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING AND CONSUMMATING THE PLAN | | 51 |
|  | A. | DISTRIBUTION PROJECTION DISCLAIMER | | 51 |
|  | B. | CERTAIN BANKRUPTCY CONSIDERATIONS | | 52 |
|  |  | 1. | Classification Risk | 52 |
|  |  | 2. | The Plan Proponents May Not be Able to Secure Confirmation of the Plan | 52 |
|  |  | 3. | The Plan Proponents May Object to the Amount or Classification of a Claim | 52 |
|  |  | 4. | Delays of Confirmation and/or the Effective Date | 53 |
|  | C. | ALTERNATIVES TO THE PLAN | | 53 |
| VIII. | | TAX DISCLAIMER | | 53 |
| IX. | | RECOMMENDATION | | 54 |

# EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Chapter 11 Trustee's and Consolidated Investors' Committee's Joint Plan of Liquidation |
| Exhibit B | - | Estimated Potential Recovery |
| Exhibit C | - | Estimated Total Claims and Recovery Percentage |
| Exhibit D | - | Example of Individual Claim Calculations |
| Exhibit E | - | Values of Berg Personal Bankruptcy Estate Assets |
| Exhibit F | - | Total Claims Based Upon Bankruptcy Schedules |
| Exhibit G | - | Net Proceeds from Liquidation of Bus Companies |
| Exhibit H | - | Loan Portfolio Summary |
| Exhibit I | - | Real Estate Owned Summary |
| Exhibit J | - | Summary of Estimated Professional Fees and Berg Entity Detail |
| Exhibit K | - | WTAS Guidance-Meridian Noteholder Losses-Tax Reporting |
| Exhibit L | - | Oversight Committee Bylaws |

**NOTE: FINANCIAL INFORMATION PRESENTED IN THIS DISCLOSURE STATEMENT INCLUDING THE EXHIBITS IS DERIVED FROM THE TRUSTEE'S CASH BASIS ESTIMATE OF PROCEEDS OF AN INTENDED ORDERLY LIQUIDATION OF THE ASSETS OF THE ESTATES**

-iv-

# I.

## INTRODUCTION

On July 9, 2010, involuntary bankruptcy petitions under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") were filed by certain creditors against Meridian Mortgage Investors Fund II, LLC ("*Investment Fund 2*"), Meridian Mortgage Investors Fund V, LLC ("*Investment Fund 5*"), Meridian Mortgage Investors Fund VII, LLC ("*Investment Fund 7*"), and Meridian Mortgage Investors Fund VIII, LLC ("*Investment Fund 8*") in the United States Bankruptcy Court for the Western District of Washington (the "*Bankruptcy Court*"). In light of the interrelatedness of factual circumstances and legal issues, Meridian Mortgage Investors Fund VI, LLC ("*Investment Fund 6*"), Meridian Mortgage Investors Fund IX, LLC ("*Investment Fund 9*"), and Meridian Mortgage Investors Fund X, LLC ("*Investment Fund 10*") filed voluntary chapter 11 bankruptcy petitions on July 28, 2010. Similarly, on August 17, 2010, Meridian Real Estate Opportunity Fund I LLC ("*Opportunity Fund 1*") and Meridian Real Estate Opportunity Fund II LLC ("*Opportunity Fund 2*") also filed voluntary chapter 11 bankruptcy petitions. On January 27, 2011, Meridian Mortgage Investors Fund I, LLC ("*Investment Fund 1*"), Meridian Mortgage Investors Fund III, LLC ("*Investment Fund 3*") and MPM Investor Services, Inc. filed voluntary Chapter 11 bankruptcy petitions. Investment Funds 1, 2, 3, 5, 6, 7, 8, 9, 10, and Opportunity Funds 1 and 2 and MPM Investor Services, Inc. are referred to collectively as the "*Debtors*."

The Bankruptcy Court has entered orders appointing Mark Calvert of Cascade Capital Group (the "*Chapter 11 Trustee*") as the Chapter 11 Trustee of the Debtors and authorizing the Chapter 11 Trustee to manage the Debtors' assets and financial affairs. On August 19, 2010, the Office of the United States Trustee (the "*U.S. Trustee*"), a division of the United States Department of Justice responsibility for oversight of bankruptcy cases, appointed an official committee of consolidated investors of the Debtors (as reconstituted from time to time, the "*Investor Committee*") to represent the interests of parties that had previously made investments in the Debtors.

Chapter 11 of the Bankruptcy Code allows parties to sponsor a chapter 11 plan that proposes how to dispose of a debtor's assets and treat claims (*i.e.*, debts) against, and equity interests in, such a debtor. A chapter 11 plan may provide for a debtor to reorganize by continuing to operate, to liquidate by selling assets of the bankruptcy estate, or to implement a combination of both. The Chapter 11 Trustee and the Investor Committee, together referred to as the "*Plan Proponents*," are sponsoring the *Chapter 11 Trustee's and Official Consolidated Investors' Committee's Joint Plan of Liquidation for Substantively Consolidated Debtors* (the "*Plan*"), which is a liquidating plan.

The Bankruptcy Code requires that the party proposing a chapter 11 plan prepare and file with the Bankruptcy Court a document called a "disclosure statement." **THIS DOCUMENT IS THE DISCLOSURE STATEMENT (THE "*DISCLOSURE STATEMENT*") FOR THE PLAN. THE DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED HEREIN BY REFERENCE.**

*Please note that any terms not specifically defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan and any conflict arising therefrom shall be governed by the Plan.*

This Disclosure Statement summarizes the Plan's content and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan. The Disclosure Statement also discusses the Debtors' chapter 11 cases (the "*Chapter 11 Cases*") and summarizes and analyzes the Plan.

The Bankruptcy Code requires a disclosure statement to contain "adequate information" concerning the Plan. In other words, a disclosure statement must contain sufficient information to enable parties who are affected by the Plan to vote intelligently for or against the Plan or object to the Plan, as the case may be. The Bankruptcy Court has reviewed this Disclosure Statement, and has determined that it contains adequate information and may be sent to you to solicit your vote on the Plan.

All Holders of Claims (as defined in the Plan) should carefully review both the Disclosure Statement and the Plan before voting to accept or reject the Plan. Indeed, Holders of Claims should not rely solely on the Disclosure Statement but should also read the Plan. Moreover, the Plan provisions will govern if there are any inconsistencies between the Plan and the Disclosure Statement.

> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS _____ \_\_.M. (PREVAILING SEATTLE, WASHINGTON TIME) ON _____, 2011, UNLESS THE COURT OR THE PLAN PROPONENTS EXTEND THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED, IN WHICH CASE THE VOTING DEADLINE FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED.**

## A.  PLAN OVERVIEW/ EXECUTIVE SUMMARY

**THE FOLLOWING SUMMARIZES CERTAIN KEY INFORMATION CONTAINED ELSEWHERE IN THIS DISCLOSURE STATEMENT. REFERENCE IS MADE TO, AND THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO, THE MORE DETAILED INFORMATION CONTAINED ELSEWHERE IN THIS DISCLOSURE STATEMENT AND IN THE PLAN. THE PLAN WILL CONTROL IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS SUMMARY AND THE PLAN.**

### 1.  Solicitation

Solicitation materials, including this Disclosure Statement and a Ballot to be used for voting on the Plan, are being distributed to all known Holders of Claims entitled to vote on the Plan. The only Classes of Claims entitled to vote on the Plan are Classes 3a and 3b. Other classes of creditors, secured and priority creditors, to the extent there are any such claims, are unimpaired and not entitled to vote. Equity interests are cancelled under the Plan and are deemed to have rejected the Plan. The purpose of this solicitation, among other things, is to

obtain the requisite number of acceptances of the Plan under the Bankruptcy Code from the Class of Claims entitled to vote. Assuming the requisite acceptances are obtained, the Plan Proponents intend to seek Confirmation of the Plan at the Confirmation Hearing commencing on [_____, 2011]. The Plan Proponents may object to or seek adjustment or estimation of the amounts of filed claims in advance of the deadline for voting on the Plan.

### 2.     Purpose of the Liquidating Plan

The Plan provides for the orderly liquidation of substantially all of the Debtors' assets, including the pursuit of certain lawsuits, and the distribution of the proceeds of such assets to creditors. The Plan constitutes a compromise among the Estates and those Investors who accept the Plan by voting in favor of the Plan or who otherwise agree to the terms of the compromise by means of timely documentation acceptable to the Plan Proponents ("*Electing Investors*"). The compromise is more fully set forth in Article IV of the Plan and is referred to in the Plan as the "*Plan Global Investor Settlement*."

### 3.     Substantive Consolidation

Subject to the occurrence of the Effective Date, the Debtors and their Estates will be deemed substantively consolidated. Intercompany Claims shall be extinguished and no distributions will be made under the Plan on account of Intercompany Claims. The assets and liabilities of the Estates shall be pooled and all Claims shall be satisfied from the assets of a single consolidated estate. Any Claims against one or more of the Estates (including Claims based upon a guaranty, indemnity, co-signature, surety or otherwise, of Claims against another Estate) shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to distributions under the Plan only with respect to such single Claim.

**Similarly, the Plan provides that, upon the Effective Date, all Investors shall be deemed to have assigned any asserted Liens that purportedly secure any respective Investor Claim to the Liquidating Trust created under the Plan.**

The Plan Proponents believe substantive consolidation of the Debtors' assets and liabilities is appropriate in light of the pervasive fraud and accounting irregularities discovered by the Chapter 11 Trustee. In particular, the significant disregard of corporate formalities and commingling of the Debtors' assets suggests that substantive consolidation of the Debtors would benefit all creditors because the expense, time, and difficulty of attempting to separate the financial affairs of the Debtors would result in a substantial overall decrease in assets available for distribution to creditors, if such a separation is even possible, due to missing financial records, including bank records.

### 4.     Establishment of the Liquidating Trust

On the Effective Date or immediately prior thereto, a Liquidating Trust shall be created and vested with the Estates' assets, including Causes of Action, which the Liquidating Trust shall reduce to Cash or otherwise liquidate and distribute in accordance with and subject to the terms and provisions of the Plan.

Case 10-17952-TWD    Doc 354    Filed 03/25/11    Ent. 03/25/11 17:31:15    Pg. 11 of 35

Additionally, Investors may elect on their Ballot to assign the proceeds of causes of action held by individual Investors arising from any matter relating to the Debtors, together with the right to opt out of any class action whether or not certified, but excluding contract claims against third parties that are specific to an individual Investor and not shared by Investors generally, including without limitation, proceeds of causes of action against (i) current and former managers or employees of the Debtors; (ii) all Entities that entered into transactions with the Debtors; and (iii) all Entities that provided services to the Debtors, including, without limitation, the Debtors' attorneys, accountants, auditors, and financial advisors (collectively, the "*Non-Estate Claims*"). Those Investors that so elect to assign the proceeds of Non-Estate Claims will share in the proceeds of the Non-Estate Claims recovered by the Liquidating Trust on a pro rata basis. Those Investors that elect to assign the proceeds of Non-Estate Claims who are holders of Allowed Unsecured Claims which are Fund 5, 6, 7 Claims shall receive a preferred recovery from the proceeds of certain claims against auditors of those funds. The Plan Proponents believe it is appropriate for Investors to make this election because it will allow for all Non-Estate Claims to be prosecuted in an expeditious and efficient manner on a consolidated basis by the Liquidating Trust, as opposed to a potentially piecemeal basis that could lead to inconsistent legal results, and where individual Investors must fund their own litigation costs. Investors who do not elect to contribute the proceeds of their Non-Estate Claims to the Liquidating Trust shall not be entitled any of the proceeds from such Non Estate Claims recovered by the Liquidating Trust.

5.    **Summary of Projected Distributions to Creditors**

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtors. The following chart summarizes the treatment of Allowed Claims and Equity Interests under the Plan. This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests. Moreover, the column entitled "Projected Recovery" is merely the Chapter 11 Trustee's good faith estimate as of the date hereof based on available information discovered in the course of his investigation. These estimates should not be deemed to be an admission, binding or otherwise, as to the amount of total Allowed Claims. The Plan Proponents reserve the right to change their estimates and object to any Claim.

| Class | Description | Treatment | Projected Recovery |
|-------|-------------|-----------|--------------------|
| Unclassified | Administrative Claims | Each Allowed Administrative Claim shall be paid by the Liquidating Trustee in Cash upon the later of the Effective Date or the date upon which such Administrative Claim is Allowed. Any application for the payment of any Administrative Claims, such as and including the payment of any fees or reimbursement of expenses of any Professional, shall be Filed with the Bankruptcy Court no later than forty-five | 100% |

| Class | Description | Treatment | Projected Recovery |
|---|---|---|---|
| | | (45) days after the Confirmation Date. Entities holding Administrative Claims that do not timely file and serve an application for allowance of such Administrative Claim will be forever barred from asserting such Administrative Claim against the Debtors, the Estates, or the Liquidating Trust. | |
| Unclassified | Priority Tax Claims | On, or as soon as reasonably practicable after, the latest of the Effective Date or the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim, or (ii) such other treatment as to which the Liquidating Trustee and such Holder have agreed upon in writing.<br><br>***The Chapter 11 Trustee does not believe that any Priority Tax Claims exist.*** | 100% |
| 1 | Other Priority Claims | ***Unimpaired.*** On, or as soon as reasonably practicable after, the later of the Effective Date or the date such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, (i) Cash equal to the unpaid portion of such Allowed Other Priority Claim, or (ii) such other treatment as to which the Liquidating Trustee and such Holder have agreed upon in writing.<br><br>***The Chapter 11 Trustee does not believe that any Other Priority Claims exist.*** | 100% |

| Class | Description | Treatment | Projected Recovery |
|-------|-------------|-----------|--------------------|
| 2. | Secured Claims | **Unimpaired**. On, or as soon as reasonably practicable after, the later of the Effective Date or the date such Secured Claim becomes an Allowed Secured Claim, each Holder of an Allowed Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Secured Claim, (i) Cash equal to the unpaid portion of such Allowed Secured Claim, (ii) the return of the collateral securing its claim, or (iii) such other treatment as to which the Liquidating Trustee and such Holder have agreed upon in writing.<br><br>***The Chapter 11 Trustee does not believe that any Secured Claims exist, other than claims of taxing authorities for real property taxes in de minimis amounts.*** | 100% |
| 3a | Convenience Class Unsecured Claims | **Impaired**. Holders of Allowed Convenience Class Unsecured Claims Holders of Allowed Convenience Class Unsecured Claims shall receive a distribution of Available Cash from proceeds of the Liquidating Trust Assets other than Non-Estate Claims in an amount which is the lesser of 15% of such Allowed Claim or Three Thousand Dollars ($3,000). | The lesser of 15% or $3,000 |
| 3b | Allowed Unsecured Claims | **Impaired.** Holders of Allowed Unsecured Claims shall receive a Pro Rata share of the beneficial interests of the Liquidating Trust, which shall entitle all such Holders to receive a Pro Rata distribution of the Available Cash constituting proceeds of the Liquidating Trust Assets other than Non-Estate Claims. Holders of Allowed Unsecured Claims who are Electing Investors who also elect to contribute the proceeds of their Non-Estate Claims to the Liquidating Trust shall be entitled to receive a Pro Rata share of the proceeds from such Non-Estate Claims received by the | 15% to 25% for other Holders of Unsecured Claims<br><br>The Chapter 11 Trustee has no basis for providing an estimate for recoveries on account of |

-6-

| Class | Description | Treatment | Projected Recovery |
|-------|-------------|-----------|--------------------|
|       |             | Liquidating Trust. Electing Investors who do not elect to contribute the proceeds of their Non-Estate Claims to the Liquidating Trust shall not be entitled any of the proceeds from such Non-Estate Claims received by the Liquidating Trust. Electing Class 5,6,7 Investors shall, in addition to distributions received by other Electing Investors, receive a Pro Rata distribution of the Fund 5,6,7 Settlement. | Non-Estate Causes of Action for Electing Investors at this time |
| 4 | Equity Interests | *Impaired.* On the Effective Date, all Equity Interests shall be cancelled and the Holders of Equity Interests shall not receive or retain any distribution or property on account of such Equity Interests. | 0% |

<u>The distributions projected in the table above represent only a range of possible recoveries that the Plan Proponents believe are reasonable based upon the Trustee's investigation. These recoveries are expected to occur over a period of years. Exhibits B and C to this Disclosure Statement provide additional detail to the range of recovery estimates.</u>

**THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANYONE. HOWEVER, IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, THEN THE TERMS OF THE PLAN WILL BE BINDING UPON ALL CREDITORS AND INTEREST HOLDERS.**

6.    **Voting and Confirmation**

Each Holder of a Claim in Class 3a and 3b will be entitled to vote either to accept or reject the Plan. Class 3a and 3b shall have accepted the Plan if: (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. Class 1 and Class 2 are Unimpaired under the Plan and are deemed to accept the Plan. Class 4 is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan. Assuming the requisite acceptances are obtained, the Plan Proponents intend to seek confirmation of the Plan at a hearing (the "*Confirmation Hearing*") scheduled to commence on [_____, **2011, at :        .m. (prevailing Seattle, Washington time)],** before the Bankruptcy Court. **Provided that Class 3a or Class 3b accepts the Plan, the Plan Proponents will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to the Impaired Class presumed to reject the Plan.**

-7-

The Bankruptcy Court has established [_____, 2011] (the "*Voting Record Date*"), as the date for determining which Holders of Claims are eligible to vote on the Plan. Ballots will be mailed to all registered Holders of Claims as of the Voting Record Date who are entitled to vote to accept or reject the Plan.

**TO BE COUNTED, YOUR BALLOT INDICATING AN ACCEPTANCE OR REJECTION OF THE PLAN AND OTHERWISE MAKING ELECTIONS AS CALLED FOR UNDER THE PLAN MUST BE RECEIVED BY THE CHAPTER 11 TRUSTEE BY NO LATER THAN _____.M. (PREVAILING SEATTLE, WASHINGTON TIME) ON _____, 2011 (THE "*VOTING DEADLINE*") UNLESS THE COURT OR THE PLAN PROPONENTS EXTEND THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED, IN WHICH CASE THE VOTING DEADLINE FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED.**

Objections to confirmation of the Plan must be filed and served on or before [____.m. prevailing Seattle, Washington time on _____, 2011]. **UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

7.     **Risk Factors**

There are a variety of factors that each Holder of a Claim should consider prior to voting to accept or reject the Plan. Some of these factors are as follows and may impact the recoveries under the Plan:

- The financial information disclosed in this Disclosure Statement has not been audited and is based on the Chapter 11 Trustee's investigation of the Debtors' financial affairs available at the time of the preparation of the Plan and Disclosure Statement. The Plan Property, however, make no representations or warranties as to the accuracy of the financial information or projections herein in light of the fraud perpetuated by the Debtors prior to the Chapter 11 Cases, the accounting irregularities involved with such fraud, and the poor quality of the Debtors' books and records.

- The Chapter 11 Trustee has not completed a tax analysis of the potential tax exposure in the Berg personal bankruptcy case. To the extent tax liabilities result in priority claims in the Berg case, those claims could result in a material deviation from the expected returns to creditors of the Funds.

- This Disclosure Statement does not purport to provide tax advice to Holders of Claims, and Holders of Claims are urged to consult with their own tax advisors regarding the federal, state, local and other tax consequences of the Plan.

- Although the Plan Proponents believe that the Plan complies with all applicable standards of the Bankruptcy Code, the Plan Proponents can provide no assurance that the Bankruptcy Court will confirm the Plan.

- Any delays of either Confirmation or the Effective Date of the Plan could result in, among other things, increased Claims of Professionals which may result in decreased distributions to creditors.

## B.   RECOMMENDATION

The Plan Proponents believe that the Plan provides the best and most feasible recovery for Holders of Allowed Claims against the Debtors and that accepting the Plan is in the best interests of the Holders of Allowed Claims against the Debtors. The Plan Proponents therefore recommend that you vote to accept the Plan.

## C.   DISCLAIMER

The discussions in the Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The distribution projections and other information are estimates only, and the timing and amount of actual distributions to Holders of Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT IS, OR SHALL BE DEEMED TO BE, AN ADMISSION OR STATEMENT AGAINST INTEREST BY THE DEBTORS FOR PURPOSES OF ANY PENDING OR FUTURE LITIGATION MATTER OR PROCEEDING.**

**THE PLAN PROPONENTS BELIEVE THAT THE INFORMATION HEREIN CONSTITUTES THE BEST AVAILABLE INFORMATION TO THE CHAPTER 11 TRUSTEE AS A RESULT OF HIS INVESTIGATION INTO THE DEBTORS' ASSETS AND LIABILITIES. THE PLAN PROPONENTS, HOWEVER, MAKE NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN IN LIGHT OF THE FRAUD PERPETUATED BY THE DEBTORS PRIOR TO THESE CHAPTER 11 CASES, THE ACCOUNTING IRREGULARITIES INVOLVED WITH SUCH FRAUD, AND THE POOR QUALITY OF THE DEBTORS' BOOKS AND RECORDS. THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.**

**ALTHOUGH THE ATTORNEYS, ADVISORS, AND OTHER PROFESSIONALS EMPLOYED BY THE PLAN PROPONENTS HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON THE FINDINGS OF THE CHAPTER 11 TRUSTEE'S INVESTIGATION, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE**

ACCURACY THEREOF. THE ATTORNEYS, ADVISORS, AND OTHER
PROFESSIONALS EMPLOYED BY THE PLAN PROPONENTS SHALL HAVE NO
LIABILITY FOR THE INFORMATION IN THE DISCLOSURE STATEMENT.

## II.

## THE CHAPTER 11 CASES

### A.    THE BEGINNING OF THE CHAPTER 11 CASES

#### 1.    The Involuntary Petitions

On July 9, 2010, certain investors (the "*Petitioning Creditors*") that had provided
financial accommodations to Funds 2, 5, 7, and 8 filed involuntary bankruptcy petitions against
those Funds. The Petitioning Creditors alleged that Funds 2, 5, 7, and 8 were affiliates in an
enterprise ultimately owned and controlled by Frederick Darren Berg ("*Berg*") and that there
were substantiated allegations of missing cash of these Funds in the amount of approximately
$10 million. In particular, the Petitioning Creditors submitted the declaration of Dennis Shay, a
recently-resigned Co-Director of Investor Relations (the "*Shay Declaration*") for these Funds,
which provides:

- Berg is the manager of Funds 2, 5, 7, and 8;

- Berg is the sole member for Funds 5, 7, and 8, and allegedly owns 75% of
  Fund 2;

- Funds 5, 7, and 8 entered into management agreements with Meridian
  Partnership Management, Inc., which is another entity owned and controlled
  by Berg;

- MPM Investor Services, Inc., an other Berg entity, provided services to Funds
  5 and 7 by acting as the agent for investors under an assignment and security
  agreement to protect the assets owned by those funds for the benefit of their
  investors;

- Berg maintained exclusive control over all of the bank accounts and any other
  cash accounts of these Funds; and

- Numerous other Meridian funds, entities, and other businesses that are owned
  by Berg exist.

#### 2.    The Shay Declaration's Allegations Against the Meridian Funds

The Shay Declaration states that the funds subject to the involuntary petitions raise
money from investors, who loan money to these funds and who receive short-term promissory
notes (the "*Notes*") that pay interest at fixed rates on a monthly basis. Each of these Funds
engage in different types of investments that are to be secured by real estate. In particular,

Funds 2, 5, and 8 purchase mortgages, and Fund 7 makes short-term commercial loans secured by real estate.

From January through May 2010, monthly interest payments were approximately $650,000 per month, and the funds remained current on all monthly interest payments through that time. In June 2010, the total amount of interest due to investors was approximately $2.2 million because the funds had agreed that investors who had been reinvesting their monthly payments in the funds, and who then wanted to be paid monthly, could elect to receive a "catch-up" payment for June for all of the interest that had accrued on their Notes since January 1, 2010.

Based on Mr. Shay's communications with certain investors, it appeared that interest payments of about $600,000 were made in June 2010, leaving about $1.6 million unpaid. After numerous confrontations with Berg about investors' inquiries concerning past due interest payments where Berg provided evasive responses, Berg finally admitted to Mr. Shay that these interest payments had not been made because there was no money to make the payments. Financial statements, however, did not comport with this conclusion and, Mr. Shay asserted in his Declaration that cash held by the funds should have been increasing throughout 2010 because (i) the funds were continuing to collect payments on mortgages that the funds owned and the loans the funds made; (ii) the funds were not required to pay any significant expenses; (iii) the funds had not been compensating certain entities for services provided; and (iv) the funds were not making payments on Note principal. Mr. Shay estimates that the funds' bank accounts should have held over $10,500,000 by June 2010. The Shay Declaration also alleges that payments received by the funds went into new bank accounts and that substantial document shredding occurred after the funds failure to pay the June 2010 interest payments.

### 3. Motions for Joint Administration of the Chapter 11 Cases

The Petitioning Creditors filed a motion seeking to consolidate the Chapter 11 Cases for administrative purposes only, which was granted by the Bankruptcy Court on July 16, 2010. The Trustee's motion to administratively consolidate Funds 1 and 3 and MPM Investor Services, Inc. was granted by the Bankruptcy Court on March 11, 2011. The Chapter 11 Cases are currently administered under a single case number, Case No. 10-17952, for administrative purposes only.

### 4. Motion to Restrain the Debtors' Operations; Appointment of Chapter 11 Trustee

In light of the assertions in the Shay Declaration and the fact that the assets of the funds are essentially all cash and negotiable instruments, the Petitioning Creditors also filed a motion seeking to restrain the funds (along with Berg and certain of his other entities) from continuing to operate, use, acquire, or dispose of any of their property. Ultimately, the relief sought was granted in an agreed order entered by the Bankruptcy Court on July 16, 2010, which also directed the U.S. Trustee to appoint a chapter 11 trustee.

On July 20, 2010, the U.S. Trustee appointed Mark Calvert of Cascade Capital Group as the Chapter 11 Trustee for Investment Funds 2, 5, 6 and 7, and the Bankruptcy Court entered an order approving the appointment on the same day. Mark Calvert was appointed as the Trustee for Meridian Real Estate Opportunity Fund I and Meridian Real Estate Opportunity Fund II in

August 2010. Mark Calvert was appointed as the Trustee for Investment Fund 1 and Investment Fund 2 and MPM Investor Services, Inc. on March 7, 2011. Pursuant to section 1106 of the Bankruptcy Code, the Chapter 11 Trustee was authorized to take certain actions for the benefit of the bankruptcy estates and creditors, including: (i) filing the Debtors' schedules of assets of liabilities and statement of financial affairs; (ii) investigate the financial affairs and conduct of the Debtors; and (iii) seek confirmation of a chapter 11 plan if possible.

On July 29, 2010, the Bankruptcy Court entered an order granting the involuntary petitions against Funds 2, 5, 7, and 8.

### 5.  Voluntary Bankruptcy Filings of Remaining Debtors

On July 28, 2010, Funds 6, 9, and 10 filed voluntary chapter 11 petitions in the Bankruptcy Court. The Bankruptcy Court subsequently entered orders (i) approving the joint administration of these cases along with the jointly administered cases of Funds 2, 5, 7, and 8, and (ii) appointing Mark Calvert as the Chapter 11 Trustee of Funds 6, 9, and 10.

On August 16, 2010, Opportunity Funds 1 and 2 filed voluntary chapter 11 petitions in the Bankruptcy Court. The Bankruptcy Court subsequently entered orders (i) approving the joint administration of these cases along with the previously jointly administered cases of Funds 2, 5, 6, 7, 8, 9 and 10 and (ii) appointing Mark Calvert as the Chapter 11 Trustee of Opportunity Funds 1 and 2.

On January 27, 2011, Funds 1 and 3 and MPM Investor Services, Inc. filed voluntary chapter 11 petitions in the Bankruptcy Court. The Bankruptcy subsequently entered orders (i) approving the joint administration of these cases along with the previously jointly administered cases of Funds 2, 5, 6, 7, 8, 9 and 10 and Opportunity Funds 1 and 2, and (ii) appointing Mark Calvert as the Chapter 11 Trustee of Funds 1 and 3 and MPM Investor Services, Inc.

## B.  THE CHAPTER 11 TRUSTEE'S ACTIVITIES

### 1.  Investigation

Immediately upon his appointment, the Chapter 11 Trustee initiated an investigation of the Debtors' financial condition and their pre-bankruptcy conduct. Among other actions, the Chapter 11 Trust, to the best of his abilities in light of the circumstances, did the following:

- obtained digital imaging of the Debtors' computers;

- located and interviewed the Debtors' former staff regarding the Debtors' operations and loan detail;

- assembled a list all loan servicers and reconciled such information;

- assembled a list of all loan assets of the Debtors and real estate owned by the Debtors as a result of foreclosure or deeds in lieu ("*REO*"), and initiated a process to confirm the accuracy of such information;

Case 10-17952-TWD   Doc 354   Filed 03/25/11   Ent. 03/25/11 17:31:15   Pg. 20 of 35

- obtained control of the Debtors' mail and cash receipts;

- took action to obtain a trustee over Berg's personal assets;

- initiated forensic analysis of the Debtors;

- sought formal discovery from various professionals previously engaged by the Debtors;

- reviewed Berg's personal disbursements;

- interviewed Berg in the presence of his criminal counsel and the Federal Bureau of Investigation ("*FBI*");

- quantified the nature and extent of the Debtors' losses; and

- assisted the FBI with its search of the Debtors' offices and taking custody of Fund financial records.

The Chapter 11 Trustee learned that Berg's various activities involved over thirty different legal entities. With respect to the various Meridian funds, at least five different accounting/loan servicing software programs were utilized, and over 50 bank accounts were used by the funds. The accounting records, however, were in very poor condition, thus necessitating further forensic analysis. In particular, mislabeling of disbursements had occurred and bank statements were missing. In short, fraud, in multiple variations and examples, is evident throughout the Debtors' records and in numerous transactions.

As a result of the procedures outlined above, the Chapter 11 Trustee determined that Berg originally utilized a bank warehouse financing line to buy discounted loans secured by real estate. Subsequently, Berg and William Juede formed funds such as the Debtors to raise capital from Investors to purchase loans and thereby replaced his bank warehouse line. Investment Funds 1, 2, and 3 obtained more capital than those funds were ultimately able to invest in loan assets. In 2001, as a result of the burden of the debt servicing (*i.e.*, required interest payments to Investors) of the under-deployed capital, Berg began directing cash from these funds to other operating companies owned by Berg, including a luxury charter bus business, a "green" home construction business, and certain software companies. Additionally, it appears that Berg diverted fund cash toward financing his lavish lifestyle, including multiple personal residences, two airplanes, two yachts, and artwork.

The Chapter 11 Trustee believes that the cash transfers from the various funds to Berg and his other entities were in excess of $85 million, of which at least $45 million in cash was diverted into the bus companies and in excess of $10 million diverted into Meridian Greenfield, LLC, the "green" home construction business. The Trustee further believes that Berg misappropriated cash from the funds to purchase and improve other assets which may rightfully belong to the funds. The Trustee also believes that Berg converted real estate belonging to the funds into his name.

-13-

In an attempt to conceal his looting of cash from the funds, approximately $50 million in additional Investor investments and loan pay-offs were used to fund interest payments to Investors since 2001, with a higher concentration in later years due partly to the fact that Berg entities had become the agent of all funds (removing any independent third party agents) by 2007. In light of the foregoing, the Chapter 11 Trustee has concluded that Berg conducted a Ponzi scheme with the funds (the "*Ponzi Scheme*").

A "Ponzi scheme" can be described as an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors. Ponzi scheme organizers often solicit new investors by promising to invest funds in opportunities that they claim will generate high returns with little or no risk. In many instances, the perpetrators focus on attracting new money to make promised payments to earlier-stage investors and to fund personal expenses, instead of engaging in any legitimate investment activity.

The misappropriation of cash from the funds started on a more limited basis in 2001, but the magnitude increased each year as Berg diverted funds into other Berg companies and for his personal use. In the Fall of 2003, Berg misappropriated approximately $4.5 million of Investment Fund 2 cash to purchase buses which rendered Investment Fund 2 insolvent. By January 1, 2004, the Ponzi Scheme was clearly commenced, and the Plan Proponents have determined that this date will be deemed to be the commencement date of the Ponzi scheme for the purposes of the Plan. Once Berg assumed the agent role for the funds (through his acquisition of PR Investor Services) in 2007, there was a complete absence of internal controls over the remaining funds' capital infusions or loan proceeds. All the Debtor funds subsequent to January 1, 2004, were involved in the Ponzi Scheme.

## 2. Schedules and Statement of Financial Affairs

On or about October 1, 2010, the Chapter 11 Trustee filed the required schedules of claims, assets, liabilities, executory contracts and other information (the "*Schedules*") and a Statement of Financial Affairs (the "*SOFAs*"). However, due to the nature, condition, and complexity of the Debtors' records, the Chapter 11 Trustee could not confirm that the Schedules and SOFAs are accurate.

As set forth in the Schedules, the Chapter 11 Trustee does not acknowledge any potential claim as a valid claim. Additionally, the Chapter 11 Trustee was unable to provide an analysis of potential preferential transfers in the SOFAs.[1] Notwithstanding the inherent problems with the Schedules and SOFAs, interested parties may obtain a copy of the Schedules and the SOFAs by emailing a request to meridian@cascadecapitalgroup.com.

## 3. Claims Bar Date

On August 30, 2010, the Bankruptcy Court entered an order establishing October 15, 2010 as the bar date for all non-governmental persons or entities to file prepetition Claims, and February 14, 2011 as the bar date for all governmental units to file prepetition Claims in the Investment Funds 1, 2, 3, 5, 6, 7, 8, 9, 10, and Opportunity Funds 1 and 2 cases.

---

[1] The Chapter 11 Trustee is in the process of preparing an avoidance action analysis.

On March 9, 2011, the Trustee obtained an order establishing April 15, 2011 as the bar date for all non-governmental persons or entities to file prepetition Claims, and September 6, 2011 as the bar date for all governmental units to file prepetition Claims in the Investment Funds 1 and 3 and MPM Investor Services, Inc. cases.

Any person or entity that is required to file a proof of claim in these Chapter 11 Cases but fails to do so in a timely manner shall be forever barred, estopped and enjoined from (a) asserting any Claim against the Debtors, and (b) voting upon, or receiving distributions under, the Plan in respect of a Claim.

The Chapter 11 Trustee has performed an initial analysis of the filed proofs of Claim. As of March 22, 2011, One Thousand Four Hundred Ninety-Eight (1,498) claims have been filed with a total face value of approximately Two Hundred Thirty-Three Million Dollars ($233 million). The Trustee intends to move for estimation of claims prior to the deadline for voting on the Plan to eliminate interest paid after January 1, 2004 for all Investor creditors and to eliminate duplicative claims.

### 4. Loan and Asset Management

The Trustee has administered more than One Hundred and Fifty (150) loans owned by the Debtors and continues to collect approximately Seventy Thousand Dollars ($70,000) per month from performing loans. Total collections from performing loans as of March 1, 2011 are $992,835. The Trustee has also administered twenty-nine real estate properties ("REO Assets") owned by the estates which were acquired via foreclosure or deeds in lieu of foreclosure. There may be other, as yet undiscovered REO Assets. During the course of administration, the Trustee has listed the majority of the REO Assets for sale.

### C. OFFICIAL CONSOLIDATED INVESTORS' COMMITTEE FORMATION

The U.S. Trustee originally appointed the Official Consolidated Investors' Committee (the "Investor Committee") on August 19, 2010. The Investor Committee is comprised of at least one representative of Investors as to each Debtor fund, and currently consists of the following members: (i) Craig Edwards; (ii) Kevin Kennedy; (iii) Cornerstone Alternative Fixed Income Fund through Joe Franzi; (iv) CRISTA Ministries and Listed Trusts and Endowments through William Brown; (v) Lance Mueller; (vi) David Buecker; (vii) Lisa O' Neal; (viii) Frank Mercker; (ix) Milton ("Peter") Barrett; and (x) Frederic Sigmund. The members of the Investor Committee are not compensated for their services.

Craig Edwards, a direct or indirect Investor in multiple Debtor funds, is the Chair. Mr. Edwards has worked most of his career in public accounting and has played a very active role in formulating the plan and interfacing with the Chapter 11 Trustee in the investigation of financial affairs of the Estates.

The Investor Committee has retained Jane Pearson of Foster Pepper PLLC as its counsel in the Chapter 11 Cases. Additionally, the Investor Committee has retained WTAS LLC to provide federal tax consulting services. A copy of the WTAS Guidance-Meridian Noteholder Losses-Tax Reporting is attached as Exhibit K.

## D. BERG'S PERSONAL BANKRUPTCY CASE AND BERG ENTITIES BANKRUPTCY CASES

On July 27, 2010, Berg filed a voluntary chapter 11 bankruptcy petition in the Bankruptcy Court (the "*Berg Case*"). Within a short time, certain Investors involved in the Debtors' Chapter 11 Cases along with the Chapter 11 Trustee sought the appointment of a trustee in the Berg Case. Berg attempted to convert the Berg Cases to chapter 7. The Chapter 11 Trustee and certain Investors successfully opposed this request and Diana K. Carey (the "*Berg Trustee*") was appointed as the chapter 11 trustee over the *Berg Case*.

On August 24, 2010, Schedules and SOFAs were filed in the Berg Case. Those Schedules indicated that Berg had $13,430,034 in assets and $8,839,313 in liabilities. The Schedules, however, did not allocate any dollar value to Berg's interests in various entities controlled by Berg. See Exhibit E attached hereto.

In connection with the Berg Case, the Berg Trustee has proceeded with liquidating certain assets such as Berg's yachts, residences, automobiles, and other luxury items. On January 14, 2011, the Bankruptcy Court approved the sale of Berg's primary residence for $5.925 million. The Court has also approved the sale of certain personal property including Sea-Doos, watches and automobiles.

On August 24, 2010, the Berg Trustee filed a motion in the Bankruptcy Court seeking ratification and approval of her assumption of control over certain Berg business entities (not including the Debtors), which was granted. On November 16, 2010, the Berg Trustee caused a voluntary chapter 11 petition to be filed on behalf of Oregon Coachways, Inc. ("*OC&W*"), which provided luxury bus services in Oregon and the western United States (the *OC&W Case*"). On November 16, 2010, the Berg Trustee caused voluntary chapter 11 petitions to be filed on behalf of certain Berg entities: Geogenius, LLC, MTR Leasing, LLC, Meridian Transportation Resources (California), LLC, Meridian Transportation Resources (Canada), Ltd., and Meridian Transportation Resources, LLC (collectively referred to as the "*MTR Entities*"), which provide luxury charter bus services in the western United States and western Canada. In connection therewith, the Berg Trustee filed various "first day" motions seeking relief to allow the Berg Trustee to continue operating the businesses of the *OC&W* and the *MTR Entities* for the purpose of facilitating a sale of the businesses on a going concern basis. The MTR Entities and OC&W are jointly administered as part of the Berg Cases and the Berg Trustee has been appointed as Trustee in those cases. In December 2010, the Court approved bidding procedures for auctions for substantially all of the assets of OC&W and the MTR Entities. The Trustee and the Investor Committee appeared in the jointly administered cases to object to the proposed stalking horse sale and to ensure that a sale process would result in reasonable value to creditors of those estates. Based upon the objection and intervention of the Trustee and the Investor Committee, the stalking horse bidder increased its offer by $750,000 for the MTR Entities assets. The auction was conducted on January 12 and 13, 2011. GTO, LLC, a Seattle based entity, was the successful bidder for the assets of OC&W and the MTR Entities. On January 27, 2011, the Court entered an amended order approving the sale of the MTR Entities assets to GTO for a purchase price consisting of assumption of secured debt and $4.75 million in cash and a promissory note in the amount of $750,000. On January 27, 2011, the Court entered an order approving the sale of the OC&W assets to GTO for the sum of $3,075,000 consisting of

$2,850,000 in cash and $225,000 payable under a promissory note. The MTR Entities' sale closed in January 31, 2011. The OC&W sale closed in February 2011. The objections filed by the Chapter 11 Trustee and Investor Committee resulted in an increase in the sale price for the MTR Entities of approximately $1.5 million and an increase of the original proposed sale price for OC&W of $1 million.

In light of the claims that the Debtors' bankruptcy estates hold against Berg personally and against the Berg Entities, and the Estates' interests in assets which are presently under the control of Berg Trustee, the Chapter 11 Trustee has appeared in the Berg Case and the Berg Entities Cases, and has sought to coordinate administration of assets in the Berg and Berg Entities cases with the Berg Trustee. The Investor Committee and the Trustee remain in active contact with the Berg Trustee for purposes of maximizing the return to creditors from assets in the Berg estate and the Berg Entities' estates.

## E.  FEDERAL INVESTIGATION AND PROSECUTION OF BERG

On or about July 16, 2010, an attorney representing Berg approached the United States government to indicate that Berg had committed fraud in connection with the Ponzi Scheme and that he wished to cooperate with the government as to any investigation. In a meeting on July 22, 2010, Berg admitted to the FBI and the Trustee the nature and extent of the fraud relating to the funds and admitted that false financial reports had been disseminated, and funds assets inappropriately applied. On October 13, 2010, the United States filed a 10-count criminal complaint against Berg for wire fraud and money laundering. At a hearing on December 1, 2010, the United States District Court for the Western District of Washington granted the government's motion to detain Berg pending the outcome the trial and sentencing. As of the date of the approval of this Disclosure Statement, Berg remains under detention.

## F.  FORMULATION OF CHAPTER 11 PLAN TERMS

### 1.  Sources of Investor Recoveries

There are three sources of potential recoveries for Investors of the Debtor funds:

(i)     recovery from the existing assets of the Debtors consisting of approximately $10 million of mortgage loans and $2.7 million of owned real estate acquired through foreclosure as described in Exhibits H and I respectively;

(ii)    recovery from the Berg Cases (from the liquidation of his personal assets, the MTR Companies and other Berg Entities) on account of the Debtors' claims against Berg and his companies which received transfers from the Debtors and the recovery of assets rightfully or equitably owned by the funds, as described in Exhibits E, F and G;

(iii)   recovery from potential avoidance actions and causes of action against former professionals of the Debtors; and

-17-

(iv)     recovery from Causes of Action against other parties to include, without limitation, against any former shareholder, director, officer, member, manager or employee of the Debtors or the Berg Entities on account of negligence or other actionable aspects of such Persons' involvement with the misconduct of the Debtors.

With respect to the first two recovery sources, attached hereto as <u>Exhibits H and I respectively</u> are a chart reflecting the respective recoveries of each Debtor fund based on (i) the liquidating value of loans held by each Debtors; (ii) the value of REO by each Debtors; and (iii) the reallocation of funds amongst the Debtors and Investment Funds 1 and 3 on account of inter-fund transfers. Exhibits E, F and G reflect potential respective recoveries from the MTR Companies and Oregon Coachways that operated the luxury bus businesses and potential recoveries from Berg's personal bankruptcy estate.

With respect to the third recovery source, the Debtors' bankruptcy estates may hold certain causes of action against: (i) former professionals of the Debtors on account of roles such professionals may have played in connection with the Ponzi Scheme, and (ii) certain Investors whereby the bankruptcy estates seek to "claw back" interest payments received by such Investors (or principal re-payments in certain instances) in order to achieve a more equitable distribution of original principal infusions amongst all Investors. From a high level, general perspective of claw back actions, an Investor that has received cash representing principal and interest which is <u>LESS</u> than the principal balance of the investment made is a "Net Creditor" (*i.e.*, is entitled to a recovery from a Debtor fund), whereas an Investor that has received cash representing principal and interest which is MORE than the balance of the investment made is a "Net Debtor" (*i.e.*, is liable to the bankruptcy estate). Projected recoveries based on causes of action against professionals and claw back actions are not included in <u>Exhibit C</u>.

## 2.     Substantive Consolidation

Notwithstanding the fact that the Chapter 11 Trustee has, to the best of his abilities under the circumstances, identified the existing assets of the respective Debtor funds as set forth on <u>Exhibit B</u>, the liquidation of such assets on behalf of each separate Debtor bankruptcy estate would involve significant administrative costs for each separate estate. For example, each estate would bear its own costs for liquidating loans and REO. Additionally, each estate would likely have to incur its own costs on account of recovering amounts from (i) other Debtor funds; (ii) the Berg Cases where Berg's personal assets, including the MTR Companies are being liquidated; and (iii) causes of action such estate may hold, which are likely duplicate of causes of action held by the other bankruptcy estates. In light of the exponential administrative costs involved with separately liquidating each Debtors' bankruptcy estate, substantive consolidation must be considered.

Substantive consolidation addresses the question of whether assets and liabilities of two or more estates (including potentially debtor and non-debtor estates) should be consolidated. Substantive consolidation results in combining the assets and liabilities of the consolidated entities into a single pool from which the claims of the consolidated creditors are satisfied. The fundamental purpose of substantive consolidation is fairness and equitable treatment of creditors. Courts consider whether the expense or difficulty of sorting out the affairs of affiliated entities

based on existing records would result in harm to creditors. Substantive consolidation is warranted where there has been disregard of corporate formalities and a commingling of assets by various entities or where the affairs of the debtors are so entangled that consolidation will benefit all creditors. Three primary considerations of substantive consolidation are applicable in these Chapter 11 Cases:

- **Were assets commingled?** The Chapter 11 Trustee has concluded that assets were commingled amongst the Debtors, Berg, and other non-debtor companies controlled by Berg.

- **Is "unwinding" costly and complicated relative to the value?** This appears to be the case, given the poor accounting records, missing accounting records, including bank statements, mislabeled disbursements in the accounting records and the general nature and extent of the fraud in the accounting records of the Debtor Funds and related business, the significant transfer of cash and loan assets between funds, the use of Funds 8, 9, 10 and Opportunity Funds 1 and 2 to fund the interest and redemptions of other funds, the lack of support of transfers at fair market value, the potential claims between funds and the cost of eight liquidations versus one consolidated liquidation.

- **Is "unwinding" a viable option under the circumstances?** This appears to be a significant issue as some of the bank statements from the 2001 and 2005 time frame are not available from the respective banks and the bank statements are missing from the Debtors' records. In addition, transfers through MPM Investor Services (which was used as a clearing account) are not able to be tracked. When more than one fund transferred funds to MPM Investor Services and more than one expense was paid or asset purchased out of MPM Investor Services, it is not possible to confirm which fund's cash was used for what purpose. Thus, it may not be possible to unravel some of the cash transfers.

### 3.    The Plan Proponent's Plan Proposal

After substantial discussions, and in light of the foregoing, the Chapter 11 Trustee and the Investor Committee have agreed to propose the Plan. As discussed herein in further detail, the Plan generally contemplates the following:

- The Plan constitutes a compromise among the Debtors and those Investors who accept the Plan by voting in favor of the Plan or who otherwise agree to the terms of the compromise by means of timely documentation acceptable to the Plan Proponents ("*Electing Investors*"). The compromise is referred to as the "*Plan Global Investor Settlement*."

- Investor Claims of Electing Investors shall be allowed based upon the amounts of the Principal Investment of such Investors, subject to adjustments based upon the receipt of distributions from the Debtors and based upon the timing of such distributions;

-19-

- Nothing in the Plan limits the Liquidating Trustee's defenses, claims, objections, rights or Causes of Action with respect to any Investor who is not an Electing Investor. With respect to Investors who are not Electing Investors, the Liquidating Trustee anticipates asserting all Causes of Action and defenses and objecting to any Claim of any such Investor who is not an Electing Investor;

- The Debtors' bankruptcy estates shall be substantively consolidated;

- As a settlement resolution of substantive consolidation issues and the rights of Fund 5, 6, and 7 Investors to proceeds of Causes of Action against auditors who performed audit services for those funds, the Fund 5, 6 and 7 Investors will receive 25% of the proceeds of any such Causes of Action to be allocated on a preferred basis to the holders of Allowed Investor Claims for Investors who made loans to and/or investments in Fund 5, 6 and 7, who are Electing Investors under the Plan, and who elect to contribute the proceeds of such claims to the Liquidating Trust, in addition to recoveries they receive on the same basis as other investors (the "*Fund 5,6,7 Settlement*");

- A Liquidating Trust, with the Chapter 11 Trustee serving as the Liquidating Trustee, shall be established to liquidate the Debtors' assets and to prosecute Causes of Action, and the Liquidating Trust shall make annual disbursements over a five year period, starting on February 1, 2012;

- Three individuals designated by the Investor Committee shall serve as an Oversight Board to the Liquidating Trust; and

- Investors shall have the option of electing on their Ballot to assign any causes of action held by individual Investors arising from any matter relating to the Debtors, together with the right to opt out of any class action whether or not certified, but excluding contract claims against third parties that are specific to an individual Investor and not shared by Investors generally, including without limitation, causes of action against (i) current and former managers or employees of the Debtors; (ii) all Entities that entered into transactions with the Debtors; and (iii) all Entities that provided services to the Debtors, including, without limitation, the Debtors' attorneys, accountants, auditors, and financial advisors. Such Electing Investors shall receive a pro rata share of the net proceeds of such "Non-Estate Causes of Action." Hence, Investors can have the Liquidation Trust pursue these Non-Estate Causes of Action for their benefit.

Attached hereto as Exhibit B is a table of estimated potential recovery scenarios for Investors. As set forth on Exhibit B, the Plan Proponents believe that the most likely scenario is that Investors may recover 15% to 25% of their Allowed Claim. Exhibit D provides examples of anticipated recoveries based upon the Plan's treatment of Investors who elect to participate in the Global Plan Settlement.

In connection with this proposed Plan, the Plan Proponents hereby make the following disclosure of their intentions as to certain matters not expressly set forth in the Plan:

- CS Note Holdco, LLC, another Berg-related entity, is not currently a debtor in any bankruptcy proceeding. To the extent that CS Note Holdco holds any Claim against the Debtors, such Claims shall receive the same treatment as similarly situated creditors under the Plan, unless the Liquidation Trustee reaches a compromise of such claims with CS Note Holdco.

- The Plan Proponents intend that the proceeds of liquidation of the estates of the Berg Case and the estates of the Berg Entities will be contributed to the Liquidating Trust and administered by the Liquidation Trustee for the benefit of all creditors of those estates.

## III.

## SUMMARY OF THE LIQUIDATING CHAPTER 11 PLAN

### A.    CHAPTER 11 PLANS

A principal objective of a chapter 11 case is to consummate a chapter 11 plan. The chapter 11 plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a chapter 11 plan by the Bankruptcy Court makes the plan binding upon the debtor, any person or entity acquiring property under the plan, and any creditor of or equity holder in the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan, or (b) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable right of the Holders of Claims or Equity Interests in classes are to remain unaltered by the reorganization to be effectuated by the plan. Such Classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the Holders of Claims or Equity Interests in such Classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such Classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the Plan. Any Classes that are receiving a distribution of property of the Estates under the Plan but are not "unimpaired" will be solicited to vote to accept or reject the Plan.

The remainder of this section summarizes the structure and means for implementing the Plan and how the Plan classifies and treats Claims and Equity Interests, and is qualified in its entirety by reference to the Plan (as well as any exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements

contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and holders of Claims and Equity Interests should refer to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The plan itself and the documents therein control the actual treatment of claims against, and equity interests in, the debtors under the Plan and will, upon the occurrence of the effective date, bind all holders of claims against and equity interests in the debtors, the debtors' estates, all parties receiving property under the Plan, and other parties–in–interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan and/or such other operative document shall govern.

Holders of Claims or Equity Interests and other interested parties are therefore urged to read the Plan and the exhibits thereto in their entirety so that they may make an informed judgment concerning the Plan.

## B. GENERALLY

### 1. Liquidating Chapter 11 Plan

The Plan is a liquidating chapter 11 plan that provides for the orderly liquidation of all of the Estates' assets, the determination of all Claims and the distribution of the proceeds of the assets to creditors. On the Effective Date, the Estates shall transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust, for and on behalf of the beneficiaries of the Liquidating Trust, with no reversionary interest in the Debtors or the Estates, all of the Estates' assets, including Causes of Action.

### 2. The Liquidating Trust

The Liquidating Trust shall be established for the primary purpose of liquidating its assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. The Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan. The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the beneficiaries treated as grantors and owners of the trust. As of the Effective Date, the Liquidating Trust shall be responsible for (i) winding up the Debtors' Estates; (ii) filing, prosecuting and settling Causes of Action and Non-Estate Causes of Action; (iii) making distributions to Holders of Allowed Claims; (iv) overseeing the continued liquidation to Cash of all other Liquidating Trust Assets; and (v) settling, resolving and objecting to Claims.

## C. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or

Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified, but the treatment for such unclassified claims are set forth in Article II of the Plan and below.

The Plan Proponents believe that the Plan has classified all Claims and Equity Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Equity Interest may challenge the classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.

Subject to the occurrence of the Effective Date, the Debtors and their Estates will be deemed substantively consolidated. Intercompany Claims shall be extinguished and no distributions will be made under the Plan on account of Intercompany Claims. The assets and liabilities of the Estates shall be pooled and all Claims shall be satisfied from the assets of a single consolidated estate under the control of the Liquidating Trustee. Any Claims against one or more of the Estates (including Claims based upon a guaranty, indemnity, co-signature, surety or otherwise, of Claims against another Estates) shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to distributions under the Plan only with respect to such single Claim.

The classification of Claims and Equity Interests and the nature of Distributions to members of each Class are summarized below. The Plan Proponents believe that the consideration, if any, provided under the Plan to Holders of Claims and Equity Interests reflects an appropriate resolution of their Claims and Equity Interests, taking into account the differing nature and priority of Claims and Equity Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Equity Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court. The "cramdown" provisions of section 1129(b) of the Bankruptcy Code, for example, permit confirmation of a chapter 11 plan in certain circumstances even if the Plan has not been accepted by all Impaired Classes of Claims and Equity Interests. The Plan Proponents will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, because of the deemed rejection of Class 3.

1.  **Treatment of Unclassified Claims**

    - Administrative Claims

Each Allowed Administrative Claim shall be paid by the Liquidating Trustee in Cash upon the later of the Effective Date or the date upon which such Administrative Claim is Allowed. Any application for the payment of any Administrative Claims, such as and including the payment of any fees or reimbursement of expenses of any Professional, shall be Filed with

the Bankruptcy Court no later than forty-five (45) days after the Confirmation Date. Entities holding Administrative Claims that do not timely file and serve an application for allowance of such Administrative Claim will be forever barred from asserting such Administrative Claim against the Debtors, the Estates, or the Liquidating Trust.

- Priority Tax Claims

On, or as soon as reasonably practicable after, the latest of the Effective Date or the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim, or (ii) such other treatment as to which the Liquidating Trustee and such Holder have agreed upon in writing. *The Chapter 11 Trustee does not believe that any Priority Tax Claims exist.*

**2. Schedule of Treatment of Claims and Equity Interests**

| Class | Claim | Status | Voting Right |
|-------|-------|--------|--------------|
| 1. | Secured Claims | Unimpaired | Not entitled to vote – deemed to accept |
| 2 | Other Priority Claims | Unimpaired | Not entitled to vote – deemed to accept |
| 3a | Convenience Class Unsecured Claims | Impaired | Entitled to vote |
| 3b | Unsecured Claims | Impaired | Entitled to vote |
| 4 | Equity Interests | Impaired | Not entitled to vote – deemed to reject |

**3. Classification and Treatment of Classified Claims**

This section sets forth the treatment provided to Holders of Allowed Claims (other than Administrative Claims and Priority Tax Claims) under the Plan. Holders of Allowed Fund 5,6,7 Claims, however, shall also receive a Pro Rata distribution of the Fund 5,6,7 Settlement, which represents a resolution and settlement by the Chapter 11 Trustee and the Estates of any potential dispute as to the substantive consolidation of the Estates under the Plan that Holders of Fund 5,6,7 Claims may otherwise raise in objection to the Plan.

**4. Class 1 – Other Priority Claims**

(a) Classification: Class 1 consists of all Other Priority Claims. The Chapter 11 Trustee does not believe any Other Priority Claims exist.

(b) Treatment: On, or as soon as reasonably practicable after the later of the Effective Date or the date such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, (i) Cash equal to the

Case 10-17952-TWD    Doc 354    Filed 03/25/11    Ent. 03/25/11 17:31:15    Pg. 32 of 35

unpaid portion of such Allowed Other Priority Claim, or (ii) such other treatment as to which the Liquidating Trustee and such Holder have agreed upon in writing.

(c)   <u>Voting</u>: Class 1 is unimpaired. Holders of Other Priority Claims are deemed to accept the Plan and are not therefore entitled to vote to accept or reject the Plan.

5.   **<u>Class 2 – Secured Claims</u>**

(a)   <u>Classification</u>: Class 2 consists of all Secured Claims.

(b)   <u>Treatment</u>: *The Chapter 11 Trustee does not believe there are any allowable Secured Claims other than claims of taxing authorities for real property taxes. Accordingly, all Claims that were filed as Secured Claims other than Claims of taxing authorities for real property taxes shall be deemed to be Disputed Claims pursuant to this Plan, and neither the Plan Proponents nor the Liquidating Trustee shall have an obligation to file any further objection to any asserted liens or security interests other than this objection set forth in the Plan.*

On, or as soon as reasonably practicable after the later of the Effective Date or the date such Secured Claim becomes an Allowed Secured Claim, each Holder of an Allowed Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Secured Claim, (i) Cash equal to the unpaid portion of such Allowed Secured Claim, (ii) the return of the collateral securing its claim, or (iii) such other treatment as to which the Liquidating Trustee and such Holder have agreed upon in writing. Holders of Allowed Secured Claims on account of real property taxes will be paid no later than the date of sale of the real property securing such claims.

(c)   <u>Voting</u>: Class 2 is unimpaired. Holders of Secured Claims are deemed to accept the Plan and are not therefore entitled to vote to accept or reject the Plan.

6.   **<u>Class 3 – Unsecured Claims</u>**

(a)   <u>Classification</u>: Class 3 consists of all Unsecured Claims. Class 3 is divided into two subclasses:

(i)   Class 3a consists of Convenience Class Unsecured Creditors holding Allowed Unsecured Claims of $20,000 or less or otherwise affirmatively electing within one year after the Effective Date to be treated as a Class 3a creditor.

(ii)   Class 3b consists of all Unsecured Claims which do not fall within the parameters for convenience class treatment or for which holders have not elected convenience class treatment.

-25-

(b)     Treatment:

    (i)     Holders of Allowed Convenience Class Unsecured Claims shall receive a distribution of Available Cash from proceeds of the Liquidating Trust Assets other than Non-Estate Claims in an amount which is the lesser of 15% of such Allowed Claim or Three Thousand Dollars ($3,000).  Holders of Allowed Convenience Class Unsecured Claims will not be entitled to any further distributions on their Claims. The distribution to each Convenience Class Unsecured Creditor shall be made as soon as practicable following allowance of such Convenience Class Unsecured Claim and prior to distributions to Class 3b creditors but only to the extent that the Liquidating Trust holds sufficient Available Cash to fund distributions to Allowed Convenience Class Unsecured Claims.

    (ii)    Holders of Allowed Unsecured Claims shall receive a Pro Rata share of the beneficial interests of the Liquidating Trust, which shall entitle all such Holders to receive a Pro Rata distribution of the Available Cash constituting proceeds of the Liquidating Trust Assets other than Non-Estate Claims.  Holders of Allowed Unsecured Claims who are Electing Investors who also elect to contribute the proceeds of their Non-Estate Claims to the Liquidating Trust shall be entitled to receive a Pro Rata share of the proceeds from such Non-Estate Claims received by the Liquidating Trust.  Electing Investors who do not elect to contribute the proceeds of their Non-Estate Claims to the Liquidating Trust shall not be entitled any of the proceeds from such Non-Estate Claims received by the Liquidating Trust.

    (iii)   Electing Class 5,6,7 Investors shall, in addition to distributions received by other Electing Investors, receive a Pro Rata distribution of the Fund 5,6,7 Settlement.

(c)     Voting:

    (i)     Class 3a is impaired.  Holders of Allowed Convenience Class Unsecured Claims in Class 3a are entitled to vote to accept or reject the Plan.

    (ii)    Class 3b is impaired.  Holders of Allowed Unsecured Claims in Class 3b are entitled to vote to accept or reject the Plan.

7. **Class 4 – Equity Interests**

   (a)   <u>Classification</u>:  Class 4 consists of all Equity Interests.

   (b)   <u>Treatment</u>:  On the Effective Date, all Equity Interests shall be cancelled and the Holders of Equity Interests shall not receive or retain any distribution or property on account of such Equity Interests.

Voting:  Class 4 is impaired.  Because Holders of Equity Interests will receive no distribution under the Plan, Class 4 will be deemed to have voted to reject the Plan.

## D.   MEANS FOR IMPLEMENTATION OF THE PLAN

1.   **The Plan Global Investor Settlement**

   (a)   <u>Overview</u>:  The Plan constitutes a compromise among the Estates and those Investors who accept the Plan by voting in favor of the Plan and agreeing to the terms of the compromise in timely submitted documentation acceptable to the Plan Proponents ("*Electing Investors*"). The compromise is more fully set forth in Article IV of the Plan and is referred to in the Plan as the "*Plan Global Investor Settlement*." Essential elements of the Plan Global Investor Settlement relating to treatment of Investor Claims and Ponzi recoveries are described in Article III.H below.

All elements of the Plan Global Investor Settlement shall be effective as of the Effective Date.  The Plan Global Investor Settlement is contingent upon Confirmation of the Plan and the Plan reaching the Effective Date.

   (b)   <u>Claim Allowance – Classification and Amount</u>:  Each Electing Investor agrees that his, her or its Investor Claim(s) shall be an Unsecured Claim(s), in an amount computed pursuant to Article III.H of this Plan. Any security interest in any assets of the Estates which otherwise have been or could be asserted by such Electing Investor will be assigned to the Liquidating Trust as part of the Plan Global Investor Settlement.

   (c)   <u>Disposition of Proceeds of Non-Estate Claims</u>:  Each Electing Investor agrees that any Non-Estate Claims, whether or not contributed to the Liquidating Trust, shall be prosecuted in a coordinated fashion with Causes of Action of the Liquidating Trust against the same Persons. The net proceeds of such litigation recovered by the Liquidating Trust shall be deposited into the Liquidating Trust for distribution in accordance with Article VI of this Plan, including the provisions respecting the Fund 5,6,7 Settlement. Electing Investors who also elect to contribute the proceeds of their Non-Estate Claims to the Liquidating Trust shall be entitled to receive a Pro Rata share of the proceeds from such Non-Estate Claims received by the Liquidating Trust. Electing Investors who do not elect to contribute the proceeds of their Non-Estate Claims to the Liquidating