**Below is the Order of the Court.**

_____
Karen A. Overstreet
U.S. Bankruptcy Judge
**(Dated as of Entered on Docket date above)**

Karen A. Overstreet
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Suite 6301
Seattle, WA 98101
206-370-5330

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

In re

CONSOLIDATED MERIDIAN FUNDS,
a/k/a MERIDIAN INVESTORS TRUST, et al.

                          Debtors.

Case No.  10-17952

MEMORANDUM DECISION
(Not for Publication)

      This matter came before the Court for evidentiary hearing on February 14, 2013, on the

motion by Mark Calvert, the Liquidating Trustee in the case herein (the "Trustee"), to hold Moss

Adams LLP ("Moss Adams") in contempt (the "Contempt Motion") for failing to comply with a

subpoena issued pursuant to Bankruptcy Rule 2004.[1]  Closing argument after the evidentiary

hearing was heard on March 1, 2013.  The following constitute the Court's findings of fact and

conclusions of law for purposes of Bankruptcy Rule 7052.

---

[1]  Unless otherwise indicated, all Code, Chapter, Section and Rule references are to the Bankruptcy Code, 11
U.S.C. §§101 _et seq._ and to the Federal Rules of Bankruptcy Procedure, Rules 1001 _et seq._

Order - 1

# I.      BACKGROUND

This case began on July 9, 2010, when involuntary Chapter 11 petitions were filed by numerous creditors of four funds managed by Frederick Darren Berg ("Berg").[2]  Dkt. 1.  These creditors alleged that the involuntary debtors were liable under investor notes of over $150 million and had defaulted in the payment of approximately $1.6 million.  *See* Adv. Case No. 10-01376, Dkt. 1.  The creditors immediately sought an injunction preventing Berg and any of the funds from transferring any assets and requiring turnover of all books and records, citing financial irregularities in the operation of the funds and missing cash in the amount of approximately $10 million.  Dkt. 23, Dkt. 22.  Following a series of contested proceedings in which the creditors sought an order for relief in the case and the appointment of a trustee, on July 20, 2010, Mark Calvert was appointed as the trustee.  Dkt. 51.  The firm of K&L Gates LLP ("K&L Gates") was employed as counsel for the Trustee.

The Trustee immediately faced a great deal of urgency in his task of taking control of the case and preserving the assets for the benefit of all the creditors.  Initially, the Trustee had to identify all of the Meridian and Berg entities, determine whether bankruptcy was appropriate for some or all of those entities, and prepare the necessary paperwork to get those entities into the bankruptcy court.  Subsequent to the Trustee's appointment, seven additional Meridian funds were placed into bankruptcy (together with the initial four funds, hereinafter referred to as the "Meridian Funds") as well as MPM Investor Services, Inc., the management company for the Meridian Funds.   In addition, on July 27, 2010, Berg filed his own voluntary bankruptcy, in which Diana Carey was appointed as trustee.  *See* case no. 10-18668, Dkt. 72.   Ms. Carey placed

---

[2]  These funds included Meridian Mortgage Investors Fund V, LLC, No. 10-17952; Meridian Mortgage Investors Fund VII LLC, No. 10-17953; Meridian Mortgage Investors Fund VIII, LLC, No. 10-17958; and Meridian Mortgage Investors Fund II, LLC, No. 10-17976.  These cases were administratively consolidated under case No. 10-17952.  Dkt. 37, 38, 39.

Order - 2

six entities owned by Berg into bankruptcy.[3]

The Trustee testified that on August 27, 2010, the FBI seized all of the books and records of the Meridian Funds and Berg. On October 14, 2010, federal authorities charged Berg with money laundering and wire fraud.[4] Berg, in a plea agreement entered on August 2, 2011, admitted that he had knowingly and willfully devised and executed a scheme and artifice for the purpose of defrauding investors. Berg was ultimately sentenced to 18 years of imprisonment, three years of supervised release, and restitution.[5] The Trustee contends that Berg engaged in a massive Ponzi scheme to defraud approximately 500 investors.

## II.  FACTS

In the context of the case as just described, on August 4, 2010, the Trustee filed a motion seeking the court's authority to issue subpoenas for the production of documents to a number of Meridian's outside professionals, including Moss Adams. Dkt. 82. The purpose of the subpoena to Moss Adams was to obtain records related to Moss Adams' auditing work for the Meridian Funds and Berg. The other professionals against whom the request for production was directed included Delloitte LLP/Delloitte Financial Advisory Services LLP (accounting and valuation records), Geffen Mesher & Company, P.C. (tax accounting records), Peterson Russell Kelly (corporate governance documents), and Mick & Associates (corporate governance and investment offering documents).

### A.  <u>The Issuance of the Subpoena</u>.

Judge Steiner entered the order authorizing the Trustee to issue a Rule 2004 subpoena

---

[3]  These entities included Meridian Transportation Resources (Canada) Ltd., No. 10-23755; Meridian Transportation Resources LLC, No. 10-23756; Geogenius LLC, No. 10-23759; MTR Leasing LLC, No. 10-23761; and Oregon Coachways, Inc., No. 10-23787.

[4] *United States v. Berg*, No. 2:10-cr-00310-RAJ (W.D. Wash. Oct. 14, 2010), Dkt. #4.

[5] *United States v. Berg*, No. 2:10-cr-00310-RAJ (W.D. Wash. Feb. 9, 2012), Dkt. #95.

Order - 3

(the "Subpoena") to Moss Adams on August 5, 2010.  Dkt. 85.  The *ex parte* motion

accompanying the order did not include the proposed form of Subpoena, so Judge Steiner never

saw the text of the Subpoena as it was subsequently issued. The Subpoena required the

production of all documents concerning Berg, the Meridian Partnership, and/or the Meridian

Funds, including audits, financial statements, tax records, billing records, and all documents

concerning communication with or involving those entities for the time period between 2000 and

2010.  Ex. P-1.  The Subpoena directed Moss Adams to produce all responsive documents

(defined to include both paper and electronically stored information ) to Christopher Wyant at

K&L Gates by August 24, 2010.  Ex. P-1.  Nothing in the Subpoena indicated that the Trustee

was formulating any action specifically against Moss Adams.  Rather, the Subpoena sought

important documents that would help the Trustee take effective control of the Meridian

bankruptcy cases.  Ex. P-1.  To date, Moss Adams has never formally raised an objection to the

Subpoena or sought to quash it.[6]

      **B.**     **Moss Adams' Internal Response to Subpoena.**

      Three individuals at Moss Adams had the primary responsibility for responding to the

Subpoena: Scott Kallander, Kathleen Quirk, and Scott Urquhart.  Mr. Kallander was hired by

Moss Adams in 2005 as the firm's first in-house legal counsel.  The evidence at trial showed that

before joining Moss Adams, Mr. Kallander had gained substantial experience in document

production related to litigation, including electronic discovery.  As in-house counsel for Moss

Adams, Mr. Kallander is responsible for legal issues facing the company, including responding

to subpoenas.  Kathleen Quirk worked as a paralegal at Moss Adams from 2007 until September

2011, when she left on good terms to pursue another employment opportunity.  At the time the

---

[6]  According to the testimony of Scott Kallander, Moss Adams' in-house counsel, Moss Adams receives between
forty and sixty third-party subpoenas each year, and its policy is to respond without interposing an objection.

Order - 4

Subpoena was served on Moss Adams, Ms. Quirk had been working for Mr. Kallander for three years and had assisted him with document production in response to other subpoenas. Scott Urquhart has worked at Moss Adams since 1995 and he was the audit partner for the Meridian accounts.

When Moss Adams received the Subpoena, Mr. Kallander was generally aware of media reports about Meridian and its financial problems. Upon receiving the Subpoena, Mr. Kallander and Ms. Quirk met to review the Subpoena, identify where responsive documents would most likely be found, and discuss who needed to be involved in the production. Ms. Quirk was then tasked with the primary responsibility of gathering and producing all the required documents. They agreed that her efforts would focus on four areas: Moss Adams' Pro Systems FX ("PFX"), paper documents, electronic documents on the Seattle office file server, and electronic documents on individual employee computers.

In 2004, Moss Adams began implementing electronic document retention using PFX, which serves as a repository for audit working papers, the final documents that support the work and conclusions made during an auditing engagement. Whether working papers, including emails, are uploaded to the system depends upon the judgment of individual Moss Adams employees. Thus, not every document is retained in PFX. PFX has been entirely integrated into Moss Adams' document retention procedures since 2005. Prior to transitioning to PFX, Moss Adams retained its documents in paper format. Paper files were stored both on-site and at an off-site storage facility. The Subpoena covered the time period between 2000 and 2010, so Mr. Kallander and Ms. Quirk knew the search would have to include both paper and PFX documents.

At the time Moss Adams received the Subpoena, each of Moss Adams' 23 offices had a practice of setting up a local file on the local file server to house documents on which individuals

were working. Since Moss Adams' transition to PFX, the local file servers are still used, but final documents are uploaded to PFX. Individual employees also save working documents on their computers, but those computers are limited to 400 megabytes for email retention. When an employee reaches that limit, they are required to either delete emails or archive them using PFX. Deleted emails exist as shadow copies on an Outlook server for a few days, then on backup tape for a few more days before they are ultimately overwritten. When employees leave Moss Adams their computers are scrubbed and reissued.

Although the Subpoena also asked for Berg's personal tax returns, Mr. Kallander believed that those records could not be released without a specific court order or the taxpayer's consent. He asked Ms. Quirk to follow up with Berg on this issue.

Moss Adams issued no litigation hold letter in connection with the Subpoena, and no broad communication was sent out to notify employees of the document production request. Ms. Quirk was entrusted with the responsibility for contacting any individuals who were involved with Meridian or Berg and for ultimately complying with the document production requested in the Subpoena. Although Ms. Quirk testified that she normally kept a log of who she contacted about subpoenas, no contact log was offered into evidence. No one conducted a search of the Outlook server for any responsive emails.

Ms. Quirk promptly contacted Mr. Urquhart to inform him of the Subpoena and request that he provide her with information regarding individuals who had worked on anything related to Meridian or Berg. She then downloaded responsive documents from the PFX system and copied them onto two discs. Ms. Quirk also contacted Moss Adams' facilities manager to obtain any responsive paper records that were in off-site storage. For large-scale paper document production, Moss Adams would typically arrange for an outside vendor to produce copies of the

Order - 6

documents. Lighthouse Legal Copy Service ("Lighthouse") was Moss Adams' vendor of choice when the Subpoena was served. Ms. Quirk testified that she would provide Lighthouse with the contact information for the receiving party to arrange for payment and delivery. Although Ms. Quirk was very emphatic in her testimony that she provided paper documents responsive to the Subpoena to Lighthouse, there is no evidence that she did so and she could not recall the time period when she delivered the documents. These paper documents will hereinafter be referred to as the "Lighthouse Documents."

Ms. Quirk had Moss Adams' IT department set up a shared drive (the "Shared Drive") to which responsive documents from the file server could be saved. She then requested that the individuals Mr. Urquhart identified search their records and their computers for Berg/Meridian documents and save them to the Shared Drive. Both Ms. Quirk and Mr. Kallander testified that the documents generated during this search of the servers were uploaded to the two discs that contained the PFX documents. Ms. Quirk did not, however, obtain the Meridian/Berg billing records to ensure that all the individuals who had worked on relevant matters were involved in the search. While some individuals saved responsive emails to the Shared Drive, others forwarded responsive emails directly to Ms. Quirk. Ms. Quirk saved the latter emails in a separate folder not on the Shared Drive; although she intended to transfer these emails to the two discs containing the PFX documents, she admitted at the evidentiary hearing that she mistakenly failed to do that.[7]

While Ms. Quirk was engaged in her collection efforts, Mr. Urquhart was also attempting to comply with the Subpoena, although he testified that this was his first time ever responding to a subpoena. He created a matrix detailing Moss Adams' history with Meridian and Berg (Ex. P-36) and searched his computer and office for responsive emails and hard copy documents. He

---

[7] Mr. Kallander testified that he discovered in October 2012 that no emails had been saved on these discs.

Order - 7

produced what he found, which included a limited number of hard copies and less than a dozen emails, to Ms. Quirk. Mr. Urquhart also contacted auditors Renee Buerstatte and Jeff Del Rosario and tax preparers Jeff Maxwell and Jim Dubeck to ask them to search their records. Mr. Urquhart later discovered that he had failed to search his email account under "completed tasks," and the emails he located after this search were produced by Moss Adams on November 27, 2012. *See* page 11 *infra*. Among these newly discovered emails was an email chain between Mr. Urquhart and Neal West, Moss Adams' chief risk officer, discussing a prospectus for Meridian Fund II that had improperly listed Moss Adams as an auditor.

### C.     <u>Moss Adams' Production of Documents to K&L Gates</u>.

On August 23, 2010, Ms. Quirk informed Mr. Wyant that she would be producing the documents responsive to the Subpoena, but that those documents would not include tax returns. Ex. D-14. She followed up on August 26, 2010, by delivering the two discs on which she had saved approximately 12,000 pages of electronic information to K&L Gates.[8] According to the transmittal letter accompanying these discs, they included "records regarding all the Meridian Mortgage Fund entities as well as Meridian Partnership Management, Inc." Ex. D-15. Although Mr. Wyant knew the discs did not contain tax information, he did not know that the discs did not contain the emails Ms. Quirk had gathered or the billing records requested by the Subpoena. In addition, no paper documents, including the Lighthouse Documents (which consisted of 2,874 pages of information), were produced with the discs nor did the transmittal letter refer to any paper documents. Ms. Quirk testified that the paper documents were produced some time after August 26, 2010, although she could not be specific as to the time frame. Ms. Quirk also

---

[8] Exhibit P-42 is Moss Adams' summary of the number of pages of discovery information it produced over the two and a half year period of production. The exhibit reflects that 22,000 pages of discovery were produced, although that number double counts the Lighthouse Documents which consisted of 2,874 pages. In total, approximately 19,400 pages of information were produced by Moss Adams.

Order - 8

testified that she neither reviewed the discs before delivering them to Mr. Wyant nor compared what she had collected for production to the Subpoena. Mr. Kallander's only knowledge of this initial production was from a later follow-up conversation he had with Ms. Quirk. Ms. Quirk admitted that as produced, the information on the two discs was not categorized, other than with 16-digit codes useful only to Moss Adams internally. After Mr. Wyant contacted her for help in sorting out the information, Ms. Quirk followed up on October 26, 2010 with an index of folder names. Ex. D-15.[9]

After October 2010, K&L Gates and Moss Adams do not appear to have had any further communications concerning the Subpoena until April 8, 2011, when Moss Adams produced 1,100 pages of billing records to K&L Gates. Ex. P-10. Mr. Kallander testified that in a conversation with Moss Adams' counsel, he realized that these billing records had not been produced earlier. The billing records showed the individuals who were part of the billing team, the general subject matter of what they did, and included copies of bills generated to Meridian as well as supporting documents. On April 20, 2011, Moss Adams produced an additional 85 pages of billing records, along with audit reports from 2006-2007. Ex. P-11. Mr. Kallander testified that hard copy audit reports for certain years and certain funds had not been produced before that date due to the transition from paper to PFX.

On October 31, 2011, an order was entered directing Moss Adams to produce the tax-related documents for Berg. Ex. P-21, Dkt. 476. Shortly after the order was entered, Moss Adams produced 130 pages of Berg's personal tax records. Ex. P-42. On November 17, 2011, Brian Peterson, an associate at K&L Gates, sent a letter to Mr. Kallander seeking confirmation that Moss Adams had produced all documents responsive to the Subpoena, and specifically

---

[9] Although the two-page index is included with Ex. D-15, the August 23, 2010 transmittal letter from Ms. Quirk to Mr. Wyant, it is clear from the testimony that this index was not provided to Mr. Wyant until October of 2010.

Order - 9

addressing various forms of electronically stored information covered by the Subpoena. Ex. P-22. Mr. Kallander never responded to this letter. In December of 2012, the Trustee filed suit against Moss Adams in state court alleging that Moss Adams' gross negligence aided Berg in defrauding hundreds of investors in the Meridian Funds. Ex. P-23.

On April 2, 2012, Michael Avenatti, counsel for the Trustee, sent an email to Moss Adams' counsel contending that Moss Adams had failed to comply with the Subpoena without justification. Ex. P-24. In response, Kelly Corr, counsel for Moss Adams, stated that Moss Adams had fully complied with the Subpoena, that neither the Trustee nor K&L Gates had raised any complaint about insufficient document production, and that this was "totally a bogus issue." Ex. P-24. On April 11, 2012, in another email exchange, Mr. Avenatti asked for confirmation that all work papers had been produced; in response, Mr. Corr stated that Moss Adams believed it had produced all work papers, and that if Mr. Avenatti had any reason to believe that was incorrect to let him know and they would promptly investigate. Ex. D-26.

After the state court complaint filed by the Trustee against Moss Adams was dismissed, the Trustee refiled the case against Moss Adams on July 30, 2012, as an adversary proceeding in the bankruptcy court (the "Adversary Proceeding"). Notwithstanding the filing of the Adversary Proceeding, Moss Adams continued its production in response to the Subpoena. On October 15, 2012, upon Mr. Kallander's confirmation, after communications with the Trustee's counsel and Ms. Quirk (who no longer worked for Moss Adams), that no emails had been included on the two discs produced in August 2010, Moss Adams produced approximately 70 pages of additional emails, some with attachments, and a voicemail. Ex. P-42.[10] On October 19, 2012, more than

---

[10] The additional emails produced include those in "Exhibit O" to Mr. Avenatti's supplemental declaration in support of the Trustee's Motion to Compel, filed on November 6, 2012. Dkt. 762, Ex. O. One email string contained in Exhibit O occurred in July of 2010 and concerns an inquiry from Craig Edwards (who became the chair of the Meridian Official Consolidated Investors' Committee in the Meridian bankruptcy proceedings) for the name

Order - 10

two years after service of the Subpoena on Moss Adams, the Trustee filed the Contempt Motion, which sought to compel Moss Adams' compliance with the Subpoena and an order to show cause why Moss Adams should not be held in contempt. Dkt. 749. A hearing on the Contempt Motion was set for November 9, 2012. On October 30, 2012, Moss Adams produced hard copies of tax related emails, as well as billing back-up, invoices and pro formas related to the billing files previously produced in April 2011. Ex. P-42. The emails had been provided to Mr. Kallander by a Moss Adams tax preparer two weeks earlier, but Mr. Kallander had overlooked them. The November 9 hearing on the Contempt Motion was continued to December 7, 2012, to permit Moss Adams and the Trustee to submit additional evidence relevant to whether Moss Adams should be held in contempt. Dkt. 914.

On November 27, 2012, 575 pages of hard copy Outlook appointments, emails, billing related records, performance appraisals and miscellaneous spreadsheets mentioning Meridian were produced by Moss Adams as well as a laptop with the PFX system and the Meridian binders. Ex. P-42. This production was spearheaded by Mr. Kallander in an attempt to satisfy the Court that Moss Adams had done everything possible to locate anything related to 'Meridian,' 'Darren,' or 'Berg.' This production also included the emails Mr. Urquhart had located in "completed tasks" in his Outlook account. Mr. Kallander testified that this heightened level of search is not something Moss Adams would typically do in response to a third-party subpoena, but that given the concerns expressed by the Court, he believed it was time to be 100% certain Moss Adams was in compliance.

On December 3, 2012, the Lighthouse Documents were produced to K&L Gates. Ex. P-42. Mr. Kallander thought these were duplicates of documents that had already been produced to

---

of a Moss Adams employee on the Meridian audit team who Mr. Edwards suspected was in a relationship with Mr. Berg. Both Mr. Kallander and Mr. Urquhart are part of the email exchange.

Order - 11

K&L Gates.  There is no evidence, however, of any earlier production of these documents, nor

any evidence to corroborate Ms. Quirk's testimony that the documents were delivered to

Lighthouse with instructions to contact K&L Gates.[11]  On December 5 and 7, 2012, 91 additional

pages were produced to K&L Gates after Mr. Kallander expanded the search to include each

server in every Moss Adams office.  Ex. P-42.  These documents included client lists and excel

spread sheets.  Mr. Kallander emphasized again to the Court that this level of searching is not

customary for a third-party subpoena, but was authorized by him out of an abundance of caution.

 At the continued hearing on December 7, 2012, the Court orally ruled that Moss Adams

had failed to comply with the Subpoena and that the burden shifted to Moss Adams under

Bankruptcy Rule 9016, incorporating Fed.R.Civ.P. 45, to show that it took all reasonable steps to

comply with the Subpoena and to articulate the reasons for noncompliance.[12]  An order was

entered on December 26, 2012, requiring Moss Adams to produce all documents responsive to

any request included in the Subpoena by January 15, 2013.  Dkt. 914.  The order set an

evidentiary hearing for February 14, 2013, to resolve issues of sanctions, contempt, and the

Trustee's requested relief.  Dkt. 914.

 On January 15, 2013, Moss Adams produced another 1,200 pages to K&L Gates.  Ex. P-

42.  Moss Adams had hired a third party vendor to assist in imaging laptops and searching them

for anything mentioning Meridian or Berg in inactive, non-live spaces on individual computers.

This production included a data base with archived tax returns from 1999-2002 and 445 pages of

electronic documents pertaining to drafts of documents, spreadsheet information, and

---

[11]  Moss Adams attempted to show that K&L Gates did receive the Lighthouse Documents in September of 2010, by reference to K&L Gates' billing statements which show an entry by Mr. Wyant on September 13, 2010. Ex. P-18, p. 97. That entry states "coordinate vendor's production" of Moss Adams' documents.  Mr. Wyant testified, however, that this entry related to K&L Gates' separate use, by coincidence, of Lighthouse to print out the information contained on the two discs delivered to K&L Gates by Moss Adams on August 23, 2010. Mr. Wyant testified that K&L Gates never received any hard copy Moss Adams documents from Lighthouse.

[12]  By order entered on December 19, 2012, the Court determined after *in camera* review that 4 pages of redacted documents produced after the Contempt Motion was filed were subject to a valid claim of attorney client privilege.

Order - 12

information pulled from unallocated hard drive space. Mr. Kallander testified that the work of the third party vendor was at a cost to Moss Adams of $36,000.

        **D.**      **The Trustee's Efforts to Preserve Estate Assets.**

        The Trustee testified that at least initially, he did not know that Berg had engaged in a Ponzi scheme. Instead, the Trustee believed the Meridian entities were merely experiencing a liquidity problem. When he assumed his duties in July of 2010, the Trustee found a complete lack of accounting records. That situation worsened on August 27, 2010, when the FBI seized all of the records of the Meridian and Berg entities. From his meeting with the FBI on August 26, 2010, the Trustee knew that there were irregularities in the financial information. Ex. P-4. He believed that obtaining records from Moss Adams and others was critical to his analysis of what funds had been diverted from these entities by Berg, whether Berg was still diverting assets, and what assets still existed which could be preserved for the estate. Without adequate records, the Trustee was attempting to reconstruct Berg's financial records from Berg's personal QuickBooks data. The Trustee testified that a key source of information would have been the audit work and loan trial balances which he contends he did not receive from Moss Adams in August of 2010. In addition, both the Trustee and Mr. Wyant confirmed that prior to December 2012, they never received the Lighthouse Documents or any notice from Moss Adams that such documents even existed.

        The Trustee's first meeting with the Meridian Fund investors occurred on August 30, 2010, shortly after Moss Adams made its initial production of documents. At that meeting, the Trustee summarized the extensive financial investigation he had already undertaken and his concerns about the lack and quality of the financial information, and reported that he had issued subpoenas to Meridian's professionals in order to obtain additional financial information. He

Order - 13

advised the investors that he suspected Berg had engaged in a Ponzi scheme to finance Berg's lavish lifestyle.

Although when the Subpoena was initially issued Moss Adams was not a target of the Trustee's investigation, by the time the Trustee met with the investors again in May of 2011, his materials specifically referenced his intention to sue Moss Adams. Ex. P-12, p. 80. The Trustee's presentation to the Meridian investors states that the FBI returned the financial records to him in April 2011, but the Trustee was still unable to determine precisely the start date of the Ponzi scheme because of the "lack of certain accounting records." Ex. P-12, p. 94. The Trustee contended that Berg controlled the auditor's procedures by working closely with Moss Adams' employees and that he believed Berg's fraud would have been detected if professional standards had been adhered to. Ex. P-12, p. 135.

The Trustee contends that Moss Adams' failure to comply with the Subpoena resulted in increased costs to the estate. The Trustee specifically referenced Moss Adams' failure to provide documents related to Meridian trial balances until late 2012. He contends that without that information he was never been able to rebuild the asset side of the balance sheets because he could never confirm all of the sources and uses of cash. Had he received that information promptly in response to the Subpoena, the Trustee testified he would have been able to ascertain on a year-by-year basis what assets existed in the estates and what assets had been transferred or were "bogus," and to determine more quickly when the Ponzi scheme began and what claims needed to be brought as a result. Instead, the Trustee resorted to subpoenaing bank records directly from the various debtors' banks, shipped all of the records to a contractor in India, and had the cash transactions painstakingly re-created.

The Trustee testified that some of the information only recently disclosed supports claims

Order - 14

he made against Moss Adams for professional negligence and that he was prejudiced in the state court litigation by Moss Adams' failure to timely disclose this information as required by the Subpoena. He also testified that he has incurred substantial fees and costs in enforcing Moss Adams' compliance with the Subpoena and that creditors of the estate should not have to bear that cost.

## III. DISCUSSION

After hearings on November 9, 2012 and December 7, 2012, the Court orally ruled that Moss Adams failed to comply with the Subpoena.[13] The purpose of the evidentiary hearing was to determine whether it is appropriate to sanction Moss Adams for that noncompliance pursuant to Rule 45(e), Fed.R.Civ.P. For the following reasons, the Court finds Moss Adams in contempt and that civil sanctions are warranted.

### A.    The Purpose of Rule 2004

Rule 2004 permits a party in interest, most importantly a trustee in bankruptcy, to examine "any entity" regarding any "acts, conduct, or property" or "liabilities and financial condition" of the debtor or regarding "any matter which may affect the administration of the debtor's estate." By its text, Rule 2004 does not require notice or a hearing before it can be utilized by a party in interest. Fed.R.Bankr.P. 2004(a); 11 U.S.C. §102(1). Consequently, in this and other districts, Rule 2004 orders are routinely issued upon the filing of an *ex parte* motion by the trustee. Also by its text, a Rule 2004 order is issued by the court and not by the clerk of court. Rule 2004(c) provides that the production of documents may be compelled as provided in Rule 9016, which incorporates the subpoena power of Rule 45, Fed. R. Civ. P. ("Rule 45"). "As an officer of the court, an attorney may issue and sign a subpoena *on behalf of the court* …." Rule 2004(c), Fed.R.Bankr.P. (emphasis added). Under Rule 2004, therefore, the movant may

---

[13]   The Court's oral rulings are incorporated herein by this reference.

```
Order - 15
```

obtain an *ex parte* order of the court which authorizes the movant's attorney to issue a subpoena under Rule 45. The rule thus provides the trustee with a powerful and important tool by which he or she can quickly compel third parties, whether creditors or non creditors, to provide information concerning the debtor's assets and liabilities and business activities. *In re GHR Energy Corp.*, 33 B.R. 451, 453 (Bankr. D. Mass. 1983)(The range of examination under Rule 2004 is "unfettered and broad."). As succinctly put by the court in *In re Dinubilo*, 177 B.R. 932, 940 (E.D. Cal. 1993):

> The breadth of a Rule 2004 examination derives from the particular purpose for which Rule 2004 and its predecessor provisions were promulgated. Rule 2004 relates to the role of a trustee in bankruptcy. A trustee in bankruptcy is under a duty to maximize the realization of the debtor's estate by marshaling the estate's assets and instituting all necessary litigation. When a trustee takes over a Chapter 7 case, the trustee must learn quickly about the debtor entity. One of the original purposes of the 2004 examination, formerly Rule 205, was to assist the trustee in this endeavor. *See Zydney v. New York Credit Men's Ass'n,* 113 F.2d 986 (2d Cir. 1940). A Long line of cases, commencing with *Cameron v. United States,* 231 U.S. 710, 34 S.Ct. 244, 58 L.Ed. 448 (1914), have defined the purpose of a 2004 examination.

The instant case is the perfect example supporting the need for a powerful and streamlined rule which allows the trustee to quickly obtain information about the debtor's financial situation from third parties. When the Trustee was appointed in the Meridian bankruptcy cases there was concern that Berg was still diverting assets from the estate, business records were not fully available and those that were available lacked trustworthiness, creditors had forced some Meridian funds into bankruptcy in order to take control of the funds away from Berg, and criminal action against Berg was in motion. Time was of the essence to preserve and protect what value remained in the estates from imminent dissipation.

Order - 16

### B.  Enforcing Compliance With a Rule 2004 Subpoena

Under Rule 45(e), a court may hold in contempt a person who fails "without adequate excuse" to obey a subpoena.  When a non-party like Moss Adams is served with a subpoena, it has three options: it may (1) comply with the subpoena, (2) submit an objection, or (3) move to quash or modify the subpoena according to the procedures set forth in Rule 45.  *See, e.g., Aspen Grove Owners Ass'n v. Park Promenade Apartments, LLC*, 2010 WL 3431155 at *2 (W.D. Wash. Aug. 13, 2010) report and recommendation adopted, 2010 WL 3431150 (W.D. Wash. Aug. 27, 2010).  "The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena." *Id.; see also* Fed. R. Civ. P. 45(e).  Disobeying a subpoena through failure to take all reasonable steps to comply constitutes civil contempt.  *Aspen Grove*, 2010 WL 3431155 at *2.[14]

Once a court finds noncompliance with a subpoena, the burden shifts to the noncomplying entity to demonstrate that it took "all reasonable steps within [its] power to ensure compliance."  *See Stone v. City & County of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992).  Noncompliance "need not be willful, and there is no good faith exception to the requirement of obedience."  *See In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).[15]   Although technical or inadvertent violations will not support a finding of civil contempt,  *General Signal Corp. v. Donallco, Inc.,* 787 F.2d 1376, 1379 (9th Cir. 1986), inadvertent violations are not a defense to contempt if the contemnor failed to take all reasonable steps to comply.  *Community Ass'n for the Restoration of the Environment v. Nelson Faria*

---

[14]  Notably, under the circumstances of this case, the Court may not resort to enforcement remedies available under Rule 37, Fed.R.Civ.P.  That rule is only applicable to adversary proceedings and contested matters.  *See* Rule 9014, Fed.R.Bankr.P. (Rule 7037 applies in contested matters); Rule 7037, Fed.R.Bankr.P. (incorporating Rule 37 into adversary proceedings).

[15]  Only the use of the Court's inherent power to sanction requires "an explicit finding of bad faith or willful misconduct" and something "more egregious than mere negligence or recklessness."  *In re Dyer*, 322 F.3d 1178, 1197 (9th Cir. 2003).

*Dairy, Inc.,* 2011 WL 6934707 (E.D. Wash. December 30, 2011).

Although on its face Rule 45(e) appears to permit a finding of contempt against a person who fails without adequate excuse to obey a subpoena, courts have generally been reluctant to invoke contempt powers for failure to comply with a subpoena without the prior issuance of a court order compelling that compliance, particularly with respect to non-parties. *See Pennwalt Corporation v. Durand-Wayland, Inc.*, 708 F.2d 492 (9th Cir. 1983); *Kilopass Tech. Inc. v. Sidenese Corp.*, 2012 U.S.Dist. LEXIS 47865, #9 (N.D.Cal. Apr. 4, 2012); *NXIVM Corporation v. Bouchey*, 2011 U.S. Dist. LEXIS 123137 (N.D. NY 2011); *Cruz v. Meachum*, 159 F.R.D. 366, 368 (D.Conn.1994). Courts are also reluctant to enforce through contempt sanctions a subpoena obtained as a matter of course from the clerk or issued by an attorney without any court involvement. *See, e.g., Cruz*, 159 F.R.D. at 368. "Court intervention serves to alert the offending party to the seriousness of its non-compliance and permits judicial scrutiny of the discovery request. The court's order also functions as a final warning that sanctions are imminent, and specifically informs the recalcitrant party concerning its obligations. A subpoena issued by counsel does not fulfill these purposes." *Daval Steel Products, a Div. of Francosteel Corp., v. M/V Fakredine*, 951 F.2d 1357, 1364-1365 (2nd Cir. 1991).

On the other hand, the Ninth Circuit Court of Appeals in the *Pennwalt* decision noted that a subpoena itself is a court order and noncompliance may warrant contempt sanctions. 708 F.2d 492, 494, FN. 5. The court clarified, however, that once a nonparty objects to the subpoena, as the nonparty had done in *Pennwalt*, it has no obligation to produce documents until a court order compelling production is issued. 708 F.2d at 494. Moss Adams contends that the only order to compel ever issued by the Court in connection with the Subpoena was the Court's order of December 26, 2012 (Dkt. 914), and that because it fully complied with *that* order, sanctions

against it should not be ordered.  Moss Adams, however, never objected to the Subpoena.  More importantly, Moss Adams and its counsel repeatedly assured the Trustee and his counsel that all documents responsive to the Subpoena, including both electronic and paper documents, had been produced, despite the fact that such assurances were incorrect.

As late as November 2, 2012, in its response to the Contempt Motion, Moss Adams stated that on August 23, 2010, it sent "two boxes of paper files to a copy vendor, which copied the paper documents and coordinated delivery to the Trustee."  Moss Adams LLP's Response to Motion to Compel, Dkt. 755 at 2.  The Declaration of Steven Fogg filed in support of Moss Adams' response details the assurances made by Moss Adams to the Trustee.  Fogg Decl., Dkt. 756.  The Declaration of Quirk filed in support of Moss Adams' response to the Contempt Motion states in paragraph 8 that Ms. Quirk sent paper documents to a third-party vendor with instructions to contact K&L Gates to coordinate the copying and delivery of the paper documents.  Quirk Decl., Dkt. 758, para. 8.  Yet, no instructions were produced at the evidentiary hearing.  Further, at trial Quirk was not able to testify as to when she sent the Lighthouse Documents for copying and admitted that they had not been assembled as of August 23, 2010, so could not have been sent to K&L Gates at that time.

Moss Adams places great emphasis on the fact that it repeatedly asked the Trustee to identify what he thought was missing from the production.  The burden, however, is not on the Trustee to sift through what has been produced (12,000 pages of documents over two-and-a-half years) and try to predict what has been held back.  It is the burden of the recipient of a Subpoena to comply fully with the terms of the Subpoena.  In addition, Ms. Quirk admitted at trial that the information produced on the two discs in response to the Subpoena was not produced in the same form as maintained by Moss Adams and that the files were not labeled or organized in any way

Order - 19

to correspond to the document categories listed in the Subpoena.[16] Given the state of the information produced, it was not even possible for the Trustee to ascertain what might be missing.

In this case, although Judge Steiner did not specifically approve of the form of the Subpoena, he authorized its issuance by his court order and under the text of Rule 2004(c), the Subpoena was issued "on behalf of the court." The standard case heading appears at the top of the Subpoena with a reference to the court and a copy of the order authorizing the issuance of the Subpoena was attached to the Subpoena. The text of Rule 45, including the admonition concerning contempt, appears in full on the second page of the Subpoena.

Notwithstanding the reluctance of courts to order sanctions when no order to compel compliance with a subpoena has been issued by the court, the Court nevertheless concludes that under the unique facts of this case, the absence of an order to compel prior to the entry of the order on December 26, 2012, does not prevent the Court from ordering sanctions if Moss Adams failed to take all reasonable steps to comply with the Subpoena.

### C. **Moss Adams Did Not Take Reasonable Steps to Comply with the Subpoena**.

The Court concludes that Moss Adams did not take all reasonable steps to comply with the Subpoena. Moss Adams issued no document retention or litigation hold of any kind. While the Court may agree that a litigation hold might not be required because of the absence of any litigation involving Moss Adams at the time, at a minimum, some written notification and instruction to those who would be required to preserve and assemble documents was not only reasonable but warranted under the circumstances. Mr. Kallander had extensive experience with document production, yet he left compliance with the Subpoena largely in the hands of a

---

[16] Rule 45(d)(1)(A) requires that electronic documents be produced as they are kept in the ordinary course of business and that they be organized and labeled to correspond to the categories in the Subpoena.

Order - 20

paralegal despite knowing that Meridian and Berg were in the news. Neither Ms. Quirk nor Mr. Kallander provided Mr. Urquhart with written instructions even though Mr. Urquhart had never responded to a Subpoena.

Ms. Quirk could have avoided the mistakes she now admits she made by merely reviewing the list of information requested by the Subpoena and checking off the categories of information requested to confirm that she had covered everything. That simple process would have revealed that paper documents were not ready for production at that time, that emails she saved in a separate folder were omitted, and that billing records were required by the Subpoena which had not been uploaded onto the discs or produced in hard copy format. In fact, according to Mr. Kallander's testimony, no emails were produced in August of 2010. No effort was made by Ms. Quirk or anyone else at Moss Adams to preserve emails on the firm's Outlook server. According to the testimony, those emails would exist only for a few days before destruction. Given that we know that relevant email exchanges were taking place internally within Moss Adams concerning Meridian shortly before the issuance of the Subpoena (*e.g.*, the email exchange in July 2010 discussed at footnote 10), it was imperative that steps be taken by Moss Adams to preserve those emails immediately upon receipt of the Subpoena. There is no way to know how many emails existed on this server when the Subpoena was served which have now been destroyed.

Moss Adams' failure to deliver paper documents promptly to the Trustee in response to the Subpoena could easily have been avoided. Assuming Ms. Quirk did in fact deliver paper documents to Lighthouse (there is no evidence that she did), it was not reasonable to deliver those documents, presumably important internal Moss Adams records, to a third-party vendor with no written instructions of any kind and with no notice to K&L Gates that it should contact

Order - 21

the vendor to obtain copies of the documents.  Ms. Quirk admittedly failed to review the billing records to make sure that every Moss Adams employee who worked on a Meridian or Berg matter was advised of the Subpoena and of their individual responsibility to preserve and collect documents.  Consequently, there may be employees who worked on Meridian matters who never searched their individual computers for emails or other responsive documents.[17]

Moss Adams contends that third parties should not be required to take all of the steps now taken to comply with the Subpoena, such as imaging laptops at a considerable cost to Moss Adams.  The Court agrees.  However, the shortcomings described in the preceding paragraphs could have been avoided without substantial cost to Moss Adams.

### D.    Civil Sanctions.

Moss Adams contends that no civil sanctions should be entered against it because the Trustee suffered no prejudice on account of Moss Adams' failure to fully comply with the Subpoena.  Moss Adams argues that the Trustee had all the financial information he needed without any information from Moss Adams as evidenced by the interview notes from the Trustee's meeting with the FBI, the Trustee's investor presentation materials, and the 52 page complaint the Trustee filed against Moss Adams in December of 2011.  In addition, Moss Adams argues that the Trustee has failed to prove that Moss Adams' failure to timely disclose the Lighthouse Documents or emails (e.g., Exhibit O), resulted in any prejudice to the Trustee with regard to his claims against Moss Adams.

The Trustee counters that his inability to obtain the trial balances for the Meridian and

---

[17]  One such employee was Dan Matthias, who, Mr. Urquhart testified, was the employee whose name Mr. Edwards was seeking in July 2010 in the email exchange contained in Exhibit O.  Mr. Urquhart testified that Mr. Matthias was not a member of the Meridian audit team so he believed the relationship Mr. Matthias may have had with Mr. Berg was a non-issue.  Because Ms. Quirk never verified which employees worked on Meridian matters by looking at the Moss Adams billing statements, however, she would not have notified Mr. Matthias of the need to collect and preserve any emails he might have exchanged with Mr. Berg.  Under Moss Adams' electronic destruction policies, those emails are now gone.

Order - 22

Berg companies hampered his ability to accurately determine the assets of the companies and Berg. He also asserts that an email contained in Exhibit O confirms his suspicions that Berg had a relationship with an employee of Moss Adams and that the relationship may have compromised Moss Adams' audit work. Moss Adams vehemently disputes that claim. At the evidentiary hearing, the Trustee testified as to an additional email string among Mr. Urquhart and others at Moss Adams indicating that Moss Adams was aware that Berg was misrepresenting to investors in Meridian Fund II that Moss Adams was auditing that fund, despite contending in the litigation that Moss Adams could not be held liable for anything related to Fund II. Thus, based upon the Trustee's testimony, Moss Adams' failure to fully comply with the Subpoena hampered the Trustee both with regard to his duties to marshal the estates' assets and his efforts to evaluate the estates' claims against Moss Adams.

Civil contempt sanctions are appropriately ordered to coerce the defendant into compliance with the court's order or to compensate the complainant for costs incurred or losses related to the noncompliance. "Generally, the minimum sanction necessary to obtain compliance is to be imposed. Unlike the punitive nature of criminal sanctions, civil sanctions are wholly remedial." *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1996). The degree to which the complaining party is prejudiced by the opponent's failure to comply with a discovery request should be considered in determining the severity of the sanction to be imposed. *In re Dinubilo*, 177 B.R. 932, 948 (E.D. Cal. 1993). Fees and costs incurred by the complaining party in enforcing the subpoena and additional fees and costs incurred as a result of the failure to fully comply with the Subpoena are an appropriate sanction for a party's failure to comply with a subpoena. *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985). Such sanctions are appropriate in this case.

Order – 23

Whether any of the newly disclosed emails will help the Trustee in the Adversary Proceeding remains to be seen. That litigation is still in the discovery phase. To the extent that any newly disclosed information justifies an amendment to the complaint in that action, the Trustee can seek such an amendment and the Court will grant or deny the request as appropriate. The Trustee initially asked that the Court to order a tolling of the statute of limitations for any newly discovered claims against Moss Adams which the Trustee could not formulate because of Moss Adams' failure to comply with the Subpoena; the Trustee did not clearly identify any such claim, however, at the evidentiary hearing. Thus, the Court finds that the appropriate sanction for Moss Adams' failure to use reasonable efforts to comply with the Subpoena is to compensate the Trustee for his fees and costs incurred in gaining that compliance. These additional costs should not be imposed on the estate and the creditors. At the evidentiary hearing, the Court indicated that the amount of the fees and costs would be determined after the hearing upon a motion by the Trustee with an opportunity for notice and hearing. The Trustee shall submit a proposed order consistent with this Memorandum Decision which sets forth a schedule for the filing of a motion for fees and costs incurred in enforcing the Subpoena and which provides Moss Adams with notice and an opportunity for hearing on that request.

///**END OF MEMORANDUM DECISION**///